ELWOOD HADLEY *et al.,* Appellants, v. ALLEN STALKER *et al.*

**Gifts:** TIME MADE. *Rights of creditors.* A grantor, in consideration of love and affection, executed a deed of a stock farm to one of his two sons who was born and raised thereon. Several years before, when he moved therefrom and his son and wife took possession, he told them he would give the son the place, with the understanding that he would remunerate his brother, to whom he

had already given some property, but not as much as the farm was worth. He said he would leave the live stock which was worth about thirteen hundred dollars on the place, and that his son might take possession of it, and pay him out of the proceeds thereof an amount each year to reimburse his brother, and the son paid two hundred and fifty dollars for a half interest therein. When the grantor left, he said that he and his wife were going to leave the son on the farm, that he wanted him to take good care of it, to improve it and to know that any improvements he made were his. Thereafter the grantor and his son treated the stock as if each owned a half interest equally, sharing the expenses, profits, and expenses of keeping and renewing the herd. The son paid the taxes on the stock but made no permanent improvements, and the grantor paid the taxes on the farm. The son intimated that his brother had been paid enough, and purchased his father's interest in the stock for four hundred and twenty-five dollars, and the deed was soon after made and recorded without his knowledge. Sometime before the conveyance, the grantor became insolvent and a bank in which he was interested had been for a considerable time kept in operation solely on his apparent responsibility as owner of the farm. The grantor must have known when he sold the stock that his bank was pressed. *Held,* that no gift of the farm was made until the deed was executed, and hence it was void as to creditors.

*Appeal from Keokuk District Court.*—HON. D. RYAN, Judge.

THURSDAY, MAY 25, 1899.

PLAINTIFFS are judgment creditors of the defendant Allen Stalker, and they bring this action in equity, seeking to subject to the payment of their claims a tract of land, the title to which is in Milo Stalker, another defendant. There was a decree in favor of defendant. Plaintiffs appeal.— *Reversed.*

*C. H. Mackey, Woodin & Son, D. T. Stockman, Hamilton & Donahoe* and *C. M. Brown* for appellants.

*C. A. Carpenter, W. R. Lewis* and *A. G. Schulte* for appellees.

WATERMAN, J.—Allen Stalker was, in 1889, a wealthy farmer of Keokuk county. He resided upon a farm of three hundred and twenty acres, valued at about fifteen thousand dollars, near Richland. Besides this farm, he owned other real estate, and was possessed of some eighteen thousand dollars in moneys and credits. Some years prior to the date mentioned, he engaged in the banking business in Richland, as a member of the firm of Charlton & Stalker, and he continued in this business until October, 1895, when he was overtaken by disaster which gave rise to this controversy. Stalker had two sons, Asberry and Milo. Upon Asberry's marriage, which occurred prior to 1889, the father gave him a farm of one hundred and forty acres and two hundred dollars in cash, and shortly afterwards one thousand dollars more in money, and in 1892 gave him another tract of eighty acres of land, which cost two thousand eight hundred dollars. In 1889 Milo married. Without going into details, it is enough to say that at the father's request Milo and his wife took possession and charge of the home farm, Allen Stalker and wife moving to Richland, where they continued to reside thereafter. On September 7, 1895, without the knowledge of the grantee, Allen Stalker and wife executed to their son Milo a deed for the three hundred and twenty-acre farm, and left the instrument with the county recorder to be entered of record. About the middle of the succeeding month the firm of Charlton & Stalker, which had long been insolvent, failed, the sheriff taking possession of all assets. After this Milo took the deed from the recorder's office. The deed purported to be made in consideration of "love and affection." It is claimed by defendants that this farm was given Milo at the time Allen Stalker moved to Richland, in 1889; that the gift was at once executed by giving Milo possession. There is evidence tending to show that at this time Allen Stalker intended giving this farm to Milo subject to certain payments which the latter was to make. The arrangement is thus described by Allen Stalker: "I told

VOL. 108 Ia—40

him that I would give him the place. That Asberry hadn't
had so much as he had, and that we would have to remunerate
him, and do something more for him, if he had the whole
place; and I wanted him to have it all. For a day or two
we talked over plans and ways about the stock, so I got
along to this plan: That I would just leave the stock on the
place, and let him take possession of it, and that he might
pay me an amount each year out of the proceeds of the stock
that was sold to reimburse Asberry, and make him up,—that
is, take off of the one and add to the other; and proposed
that he give me the one-half, or, that is, he pay me what he
could toward the stock that was on the place, and then, when
anything was sold, just divide equal,—he might take half and
pay me half,—and he accepted that. That he was to pay
me a certain amount, and then as an interest in the stock that
was on the place. We had the cattle and hogs and sheep.
He was to pay me two hundred and fifty dollars, as I
remember it. There was two hundred dollars of it, I know
exactly, was to be paid. The other fifty dollars I can't
remember how that was paid. I have it in my mind it was
two hundred and fifty dollars he was to pay." This was
the preliminary talk as to the claimed donor's intention.
The gift was made or completed, as is now asserted, at the
breakfast table on the day the old people moved. Allen
Stalker tells of the matter in these words: "The morning
my wife and I were going to move, as we were sitting at the
breakfast table, I said to them: 'Now, Milo, we are going
to move to town, and leave you here with the farm, and I
want you to take good care of it, and try to do well by it,
as I have tried to do, and improve it all you want to; and
any improvements that you are a mind to put on it I want
you to know that you are working for yourselves.' I also
spoke of the arrangement that we had entered into, so that
there might be nobody in the dark about it." The live stock
mentioned was worth about one thousand three hundred dol-
lars. Milo paid the two hundred and fifty dollars for a one-

half interest. After this, the stock was fed and marketed by Milo, and the gross receipts equally divided between him and his father. They paid in equal shares for all stock purchased to renew the herd. The total receipts from sales of stock up to August, 1895, were over eleven thousand dollars. About two thousand dollars of this was expended from time to time to purchase other stock. Asberry was given an additional sum of two thousand eight hundred dollars, in 1892, in the farm of which we have already spoken. In August, 1895, Milo told his father, in substance, that he thought he had paid enough to make matters even between him and Asberry. The father assenting, Milo purchased his interest in the stock on hand for four hundred and twenty-five dollars, and afterwards, as stated, the deed was executed. During the years from 1889 to 1895, inclusive, Allen Stalker paid the taxes on the farm, and Milo paid taxes on the stock. Milo made certain improvements upon the farm during this period, but they were inexpensive, and substantially all of such a character as were necessary for his immediate use. We cannot follow counsel through all the incidents of the case without unduly lengthening this opinion. We shall content ourselves with giving our conclusions. That Allen Stalker, when he left the farm in 1889, intended some time to give it to Milo, we have no doubt. That he then made a present gift of it, we do not believe. Neither is there any warrant for saying that the transaction was in part a gift and in part a sale. The amount Milo was to pay was never fixed, or even approximated. As a matter of fact, he paid nothing. He and his father were in partnership in the keeping and selling of live stock, and they divided the profits. That is all there is of it. Milo gave nothing out of his share. The father furnished the farm, and paid one-half the cost of the stock, and Milo did the work. Milo had much the best of this transaction. In August, 1895, when the father sold his interest in the cattle to Milo, he was well aware that the bank was in financial difficulty. He may not

have known its exact condition, but, even in the absence of direct evidence as to his knowledge, we should be unable to agree with his counsel, who assert that he was wholly ignorant of the business or its condition. He had been connected with this bank for many years, had taken a part in its management, and must have been to some extent familiar with the business. It is undisputed that in August, 1895, he knew the bank was pressed for money; that some of its paper had been dishonored. It cannot be other than true that the bank was kept in operation for a considerable time solely on Stalker's apparent responsibility, and this valuable farm was, so far as the public knew, a part of his assets. Milo's possession of the farm is hardly a factor in the case. He was born, and had always lived, upon it. Both parties offer in evidence oral admissions and declarations of Allen and Milo Stalker, some in support of, and others adverse to, the latter's title. We allow them but little weight. They are all of that character which it is said should be received with great caution,—random statements made in casual conversation. 1 Greenleaf Evidence, 200; *Allen v. Kirk,* 81 Iowa, 658; *Martin v. Town of Algona,* 40 Iowa, 392. So far as the acts and conducts of these parties after 1889 are concerned, nothing is shown that is inconsistent with the relation between them of landlord and tenant, and the fact that Allen Stalker continued during these years to pay the taxes on this farm is very significant in support of the existence of such relation. Our conclusion is that no gift of this land was made until the execution of the deed on September 7, 1895, that the claims of plaintiffs were in existence at the time, that the grantor was then insolvent, and the transfer is therefore invalid as against the indebtedness which is here asserted. The decree of the district court will be REVERSED.