|133   11|
|136   122|

L. E. ELLIS as Administrator of the Estate of BESSIE EDITH NELSON, Deceased, Appellee, v. THE REPUBLIC OIL COMPANY, Appellant.

**Negligence in the sale of oil:** EVIDENCE. The evidence, in an action for a death caused by the explosion of a substance sold by defendant and used by plaintiff's intestate as kerosene oil,

is held to require a submission of defendant's negligence in the sale and delivery of the same to the jury.

**Instinct of self preservation:** PRESUMPTION. Where there were no living witnesses of an accidental death the presumption that deceased was in the exercise of due care obtains.

**Accidental death:** CONTRIBUTORY NEGLIGENCE: EVIDENCE. Under the evidence in the instant case, the use of what was supposed to be kerosene oil to kindle a fire from which an explosion resulted causing death, it is held to present a question of contributory negligence for the jury.

**Verbal admissions:** PROOF: INSTRUCTION. The statements of a witness as to verbal admissions of a party should be considered by the jury with great caution, but when repeatedly and understandingly made and the precise language is detailed often afford satisfactory evidence.

**Damages.** A judgment for $3,000 in an action for negligence causing the death of a girl fifteen years of age, of average health, intelligence and capacity, is not excessive.

*Appeal from Polk District Court.*— HON JAMES A. HOWE, Judge.

SATURDAY, DECEMBER 15, 1906.

The opinion states the case.— *Affirmed.*

*Read & Read,* for appellant.

*E. H. McVey* and *P. L. Sever,* for appellee.

WEAVER, J.— The case made by the plaintiff's petition is, in substance, as follows: The defendant, the Republic Oil Company, is a corporation engaged in the wholesale gasoline and kerosene oil trade at the city of Des Moines, Iowa, and as such dealer sold said products to Anderson & Bergman, a firm of retail grocers in said city. On July 20, 1904, in response to an order from Anderson & Bergman, defendant undertook to deliver to them a quantity of kerosene oil, and deposited what it claimed to be the designated quantity of that product in a tank kept by the grocers for such purpose.

On the following day several of the customers of Anderson & Bergman, including the father of the intestate, having ordered small quantities of kerosene oil, an employé of Anderson & Bergman filled two cans, one of about five gallons and one of one gallon capacity, from the tank above mentioned, placed them in a wagon, and went out to make the delivery. At the home of Nelson he poured a gallon from the larger can into a can kept by the family for that use, and distributed the remainder among five other customers in that neighborhood. Living with said Nelson at this time was his daughter, Bessie Edith Nelson, a girl in the fifteenth year of her age. On the morning of the second day after the delivery of the oil the girl undertook to build a fire in the kitchen stove, when an explosion occurred from which she received injuries resulting in her death in a very short time. No other use had been made of the oil by the Nelsons prior to the accident, except to fill a lamp which had not been lighted. It is alleged that, instead of filling Anderson & Bergman's tank with kerosene oil of the proper grade and test as ordered, defendant negligently delivered therein gasoline or oil with which gasoline had been mingled in dangerous quantities; that Anderson & Bergman, believing the same to be kerosene oil, delivered it as such to Nelson; and that the girl, having no knowledge of its true character, made use of a small quantity in preparing kindling with which to build a fire, and without fault on her part the fatal explosion ensued. The defendant admits sale of kerosene and its delivery in the tank of Anderson & Bergman, but denies all other allegations of the petition. There was a verdict for plaintiff as administrator of the estate of the deceased in the sum of $4,000, from which amount there was remitted the sum of $1,000. From the judgment rendered against it on the reduced verdict, defendant appeals.

1. With the exception of a single paragraph of the court's charge to the jury, the objections raised by counsel

in behalf of appellant go wholly to the question of the suffi-

**1. NEGLIGENCE IN THE SALE OF OIL: evidence.** ciency of the evidence to support a verdict in plaintiff's favor and to the alleged excessiveness of the damages assessed by the jury. It is to be admitted that appellant makes a strong defensive showing, leaving the truth as to some of the material facts a matter of no little doubt, but we are convinced that the record as a whole is such as to fairly bring it within the universally accepted rule that issues of fact upon which, under the evidence, there is any room for difference of opinion among fair-minded men, must be left to the arbitrament of the jury. It is shown without dispute that Nelson or his wife ordered from Anderson & Bergman one gallon of kerosene, and that the driver of said firm delivered and placed in Nelson's oil can one gallon of material supposed to be kerosene, and from the same supply and on the same trip filled small orders for kerosene by five other customers in the same vicinity. It is also fairly well established that this article so delivered to these customers was either gasoline or kerosene with which gasoline had been mingled to a dangerous degree. In addition to the circumstances attending the explosion which strongly tends to this conclusion, it is shown by four of the five other customers served on the same trip that immediately after the accident they tested the oil so purchased by them and found it to flash after the manner of gasoline. Experiments, examinations, and tests made by others substantially all support the same view. If the article thus delivered to Nelson for kerosene oil was gasoline or kerosene mixed with gasoline, it is obvious that some person or persons were negligent with respect thereto; for, to say nothing of common-law rules, our law forbids the sale of kerosene of a quality below the established standard and of gasoline, except under regulation as to label which shall give notice to all of its true character. The Nelsons testify that they used no gasoline, and kept none in the house, and this is not controverted, a fact which sufficiently eliminates

any theory that the presence of such article in their oil can was chargeable to their own act. It is also shown without dispute that the article delivered to Nelson was taken by Anderson & Bergman's driver from the white oil tank which appellant concedes it filled. With this as a starting point, we are led inevitably to the conclusion that the responsibility for the mistake rests either upon the appellant or upon Anderson & Bergman; for there is no testimony whatever that any other person or persons had anything to do with handling, controlling, or using the oil and gasoline, or the receptacles in which they were stored, or the manner and means employed in their sale and delivery.

To make the situation clearer, we will briefly recite the conceded facts concerning the manner in which the business was carried on. Appellant kept stored in separate receptacles gasoline and two brands of kerosene oil, known as " Palacine " and " Prime White." These products were distributed and delivered to retail dealers in the city by the use of tank wagons. These wagons were divided into several compartments for the different grades or kinds of products above mentioned. The compartments were not labeled, and, as we read the record, they were not always filled with the same product, but sometimes one, and other times two or more would be filled with gasoline or with kerosene, as the demands of the trade required. The wagons were loaded by the use of a hose or pipe leading from separate storage tanks at appellant's warehouse and attached as occasion required to the proper compartment of the wagon. The driver of the wagon would then proceed to the place of business of the retail dealer and fill his order by drawing the oil or gasoline into buckets from which he poured it into the receptacles kept by the dealer for that purpose. Anderson & Bergman were regular customers of appellant, and dealt in gasoline and in both brands of kerosene. On July 20, 1904, they had in use three tanks of about 55 gallons capacity each, one of which was used for the storage of gasoline and the others

for the storage, respectively, of Palacine and Prime White kerosene oil. When appellant's driver àrrived to make a delivery on the day named, each of these tanks had been partially emptied, and he proceeded to fill them from his wagon, putting thirty gallons in the gasoline tank, ten gallons in the white oil tank, and twenty in the Palacine tank, using buckets in the usual manner and drawing oil and gasoline from the wagon through faucets attached thereto. The same buckets were used in handling all three products. On the day before the accident the appellant made a second delivery to Anderson & Bergman of twenty gallons of the white oil, and three days later a third delivery of forty gallons, placing the same in the same tank which received the ten gallons on July 20th. This embraces substantially all direct evidence as to appellant's connection with the case. The three tanks then in use by Anderson & Bergman are described as having openings at the top through which they were filled. The one containing gasoline and the one containing Palacine oil were supplied with faucets near the bottom, through which the contents were drawn in filling retail orders, while the tank with white oil had no faucet and the contents were taken out from the top with a bucket or measure. It was from this tank containing white oil that the driver for Anderson & Bergman claims to have taken the oil sold to Nelson.

If any mixture or substitution of gasoline for oil took place, there is nothing to suggest that it was intentional; and the possibility of its having been done by negligence or mistake seems to be limited to (1) mistake by appellant's driver in loading the tank wagon; (2) use of a wrong faucet in drawing from the tank wagon to fill the grocer's white oil tank; (3) pouring into the white oil tank the contents of buckets intended for the gasoline tank; or (4) mistake by Anderson & Bergman's driver in filling the cans from which he made the deliveries to Nelson and others. Both drivers swear to their care and to their feeling of certainty that they were in no manner negligent. The fact that Anderson

& Bergman's gasoline was drawn from their tank only through the faucet, while the white oil was taken only by dipping from the top tends in some degree to negative any inference of mistake or confusion on part of their driver as to the article with which he filled the cans.   He furthermore testifies that before using the cans he inverted them and found them empty.   He is also corroborated by one of his employers, who saw him filling the cans preparatory to the delivery.   The appellant's driver also finds a measure of corroboration in the fact that, except those served by Anderson & Bergman upon this one delivery, no complaint of the quality of the white oil sold from said tank appears to have been made, and by the fact that several tests of oil taken from that tank after the accident appear to have indicated its standard quality; but the force of this corroboration is to some extent broken by the further testimony that at least one sample taken from said tank appeared to be below standard grade, and that before the specimens were taken for any of the tests the tank had been once, if not twice, replenished by new deliveries from appellant's warehouse.   We may give full credit to both drivers for honesty and truthfulness, yet, as we have already intimated, the jury was authorized to conclude that there was, in fact, negligence on the part of one or the other of them, and to find as between them that the balance of probabilities under the evidence indicated the appellant's driver as the one in fault — not that he was any less trustworthy, but because the chances for him to commit the mistake were several times as great as those under which the other driver labored — for, as we have said, the one opportunity for the latter to be responsible for the blunder was in the filling of his cans for the delivery made by him on July 21st, while the former could have brought it about by a mistake in the loading, or in laying his hand upon the wrong faucet in drawing out the contents, or by confusion or carelessness in distributing the buckets of liquid to their proper receptacles in the grocery.

Nor is this, as counsel argue, a mere process of conjecture. If A., owning standard-grade oil, directs his agent, B., to deliver it to C., whose agent, in turn, delivers it to D., proof that upon its delivery to B., it was of pure and unmixed quality, and upon the final delivery to D. it was found to be a mixture of oil and gasoline, directly and legitimately tends to the conclusion of negligence by some person or person who have handled or dealt with the article in its course of transmission. If but one such person is found, the inference of his negligence is so strong that the unexplained circumstances bring the case well within the principle, if not the rule, of *res ipsa loquitur,* and justify a finding against him. If two such persons are found who handled the article in succession, neither being responsible for the conduct of the other, and the evidence failing to indicate one rather than the other as the person in fault, it may be (we do not decide) that a verdict against neither could be sustained; but, where the evidence is such that the jury may reasonably exonerate one, it does not necessarily tend to weaken, but rather by the process of exclusion to strengthen, the inference of negligence against the other. To follow the suggestion of counsel, and say that by the negligence of some other person unknown or by the mischievous or malicious intervention of some stranger concerning whom there is no testimony, gasoline may have been introduced into the oil tank, is clearly to do that which counsel deprecate; that is, enter the field of conjecture in search of a reason for disregarding legitimate and material evidence. Nor is the case obnoxious to the rule which requires direct proof of facts by which to circumstantially establish a material fact in issue; for the facts justifying the inference of negligence are here shown by direct testimony. Without further discussion upon this phase of the case, we think plaintiff was entitled to go to the jury upon the question of the alleged negligence of the appellant.

It is said, however, that there was not sufficient showing of absence of contributory negligence on part of the deceased.

To this contention it may first be said that there is no living
witness of the explosion or of the circumstances under which the unfortunate girl met her death, and the administrator of her estate is in this action entitled to the presumption of due care on her part arising from the common instinct of self-preservation which naturally leads a normal person to avoid danger. *Dalton v. Railroad,* 104 Iowa, 26; *Huggard v. Glucose Co.,* 132 Iowa 724; *Mynning v. Railroad Co.,* 64 Mich., 93 (31 N. W. 147, 8 Am. St. Rep. 804); *McBride v. Railroad Co.,* 19 Or., 64 (23 Pac. 814); *Cassidy v. Angell,* 12 R. I. 447 (34 Am. Rep. 690); *Johnson v. Railroad,* 20 N. Y., 65 (75 Am. Dec. 375).

2. INSTINCT OF SELF-PRESER-VATION: presumption.

The weight of the testimony of those who were first upon the scene is to the effect that the body of the girl was found lying near the door and the oil can near the corner of the room, both several feet distant from the stove. The walls and floor of the room were blackened and blistered from the heat. The stove lids were in place on the stove, and on removing them the kindling wood was found there apparently as it had been laid by the girl, undisturbed and unburnt. If this be true, it is quite certain that the explosion was not occasioned by oil or gasoline turned into the stove, and ignited by fire smoldering in the ashes or by a match applied to the saturated kindling, for, had it been so produced, it is hardly possible that the stove lids would not have been thrown off, or that the kindlings would not have been scattered or burned. The more natural inference would seem to be that the air of the room had in some manner become so impregnated with gas or vapor from the contents of the can that explosion followed immediately upon striking the match and before the girl had time to reach the kindling. In the absence of any showing or suggestion that she was in any manner responsible for the character of the contents of the oil can, or that any reason existed to excite her suspicion that the can was not filled with stand-

3. ACCIDENTAL DEATH: contributory negligence; evidence.

ard kerosene, there is certainly no showing on which we can say as a matter of law that she was guilty of contributory negligence. The use of kerosene in kindling fires is too common and too well known for us to say that a person using reasonable care may not employ that agency without being chargeable with negligence. It is said in argument that this may be true, and yet the court should hold it negligence to pour oil directly from the can into a stove, in which there is, or may be, fire. But it is not conceded nor is it shown beyond question that such was the manner of the accident. The only evidence of that nature is given by one witness who claims to repeat what the girl said in the interval between her injury and her death, three or four hours later. The story told by other witnesses, if credible, casts doubt upon this testimony, and the tendency of other proved circumstances is, as we have seen, opposed to this theory. There was no error in refusing to direct a verdict for the appellant on the ground of contributory negligence by the intestate.

II. The instruction to the jury of which complaint is made is in the following words: "Testimony with regard to verbal statements should be received with great caution. The

4. VERBAL AD-
MISSIONS:
proof:
instruction.
evidence, consisting, as it does, in the mere repetition of oral statements, is subject to much imperfection and mistake, in consequence of the person speaking not having clearly expressed his own meaning, or in consequence of the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the person in fact did say. This kind of testimony should be scanned closely. Where the precise words are shown and proven, by intelligent and reliable witnesses, they often lead to satisfactory conclusions. Where a witness can only give what he thinks is the substance of what was said, the weight to be given to such testimony depends largely upon the strength of memory and intelligence of the witness."

Were the question thus presented a new one, the writer of this opinion would incline to the view that the instruction is open to criticism as being an infringement by the court upon the exclusive province of the jury. But a charge to the same effect has received the sanction of this court, and for many years it or its equivalent has been in very general use by the trial courts, where evidence of the kind referred to is to be considered. The rule which approves this practice has been too long followed to justify us in now treating it as an open question. *Martin v. Algona,* 40 Iowa, 390; 1 Greenleaf, Evidence 200; *Allen v. Kirk,* 81 Iowa, 670; *Hadley v. Stalker,* 108 Iowa, 628. The error assigned upon the giving of the instruction cannot be sustained.

III. Upon the final suggestion that the damages are excessive, we are agreed that the amount of the judgment is not so unreasonable as to justify our interference. Indeed, it would seem that $3,000 is a fairly modest estimate to put upon the present value of the life of any person of average health, intelligence, and capacity who is cut off at 15 years of age. Nor does the fact that the intestate was a girl, instead of a boy, afford any reason for discounting this proposition in these days when the services of women in the school, office, and shop, as well as in the household, find market everywhere at remunerative figures. The court can fix no rigid or inflexible rule or standard by which to assess such damages. They must be reasonable, but what is reasonable is a question for the jury, and the court should not set it aside unless the verdict be so excessive as to shock its sense of justice.

5. DAMAGES.

There is no reversible error in the record, and the judgment of the district court is *affirmed.*