W. H. Azeltine, Administrator, Appellee, v. George Lutterman
et al., Appellants.

No. 41824.

May 15, 1934.

Rehearing Denied September 20, 1934.

E. H. Lundy, for appellants.

Bryson & Bryson, for appellee.

ANDERSON, J.—This is an action for damages for alleged negligence in the sale and delivery of kerosene. The plaintiff-appellee's intestate, Garnet Azeltine, was the wife of W. H. Azeltine. They resided on a farm southeast of Iowa Falls, Iowa. The defendant-appellant George Lutterman, at the times hereinafter mentioned, was operating a tank wagon for his codefendant, Skelly Oil Company. On November 19, 1930, the said Lutterman sold to the Azeltines thirty gallons of kerosene which was by him deposited in a yellow drum or barrel at the farm home of the Azeltines. According to the testimony of Lutterman, this kerosene was taken from a storage tank of the Skelly Oil Company at Iowa Falls, the contents of which had been inspected by a state inspector; that a portion thereof was sold and delivered to one Albert Johnson and another portion to W. H. Azeltine. The plaintiff contends that the liquid so deposited in the yellow tank or barrel was not kerosene, but a dangerous mixture containing a high percentage of gasoline which flashed at a temperature of 65 degrees when tested after the accident in question. Azeltine had other tanks or barrels at his farm home which did contain gasoline, but which Azeltine claims were kept segregated at some distance from the yellow tank or barrel in which the purchase of November 19th was deposited. On Monday night preceding the accident, Azeltine went to the yellow barrel and filled a three-gallon kerosene can with the liquid which Lutterman had deposited in the barrel and took it to the house for his wife, Garnet, to use in filling the lamps and starting the fires. This three-gallon can was grey with blue stripes and was kept closed when not in use. The testimony of Azeltine shows that he used the contents of this three-gallon can on three or four mornings in starting a fire in the kitchen stove and some of it was used in filling the lamps; that he did not notice anything unusual about the liquid when he so used it; that he poured a quantity of it upon cobs in the fire box of the kitchen stove and then ignited it with a match, but he noticed no

explosion or anything that would indicate that the liquid was something other than kerosene. On Friday, January 2, 1931, Azeltine and his wife, Garnet, had been away shopping and returned home about 5 p. m. Garnet took the baby, who was less than a year old, and proceeded to the house a few moments ahead of her husband. When her husband went into the house, Garnet was apparently preparing to start a fire in the kitchen stove. Azeltine passed behind her and went across the room to place some groceries upon the table. While his back was to his wife an explosion occurred and set fire to the house and the clothing of Garnet. On looking around the husband saw his wife's clothing in flames and saw her running across the room to the front room where the baby had been left. He ran across the kitchen and to the outside to get a rug or garment of some kind to put out the fire. As he attempted to return the kitchen was so full of flame and fire that he could not enter and he ran around to the front room window, tore off a storm window and broke another window and took his wife out through the window. He then went in and took the baby out. He then put his wife and baby in his automobile and proceeded to a hospital, where the wife died in about five hours as a result of the burns received in the explosion and the resulting fire. The next morning the three-gallon can was found in the corner of the kitchen across the room from the stove. The top and bottom had been blown out by the explosion. A state oil inspector went to the Azeltine farm home about 8:30 the next morning and took possession of the exploded can and also took a sample of the liquid from the yellow oil drum or barrel, and also took samples from the lamps. All these samples were tested by him and flashed without any heat at a temperature of 65 degrees. He also took a test from Lutterman's tank wagon and from the storage tank at Iowa Falls on the same day, and these samples flashed at a temperature of 136 degrees. The inspector also testified that he had tested the last car of kerosene which was put into the storage tanks, and it tested 151 degrees, which was a proper test; that the lowest flash test recognized on kerosene is 100 degrees; that ordinary kerosene runs from 115 up to 180; that from a safety standpoint the higher test is the better; that a liquid testing 65 degrees indicates that it was a fluid that could not be sold as kerosene under the state law; and that it would be a dangerous fluid to use as an illuminating oil. It developed in the cross-examination of Mr. Azeltine that he had bought considerable quantities of both

gasoline and kerosene of Lutterman during the months preceding November, 1930, and his attention was specially called by appellant in cross-examination to a delivery made to him on October 8, 1930, of forty gallons of gasoline and fifty gallons of kerosene; that Azeltine had three red barrels or tanks at that time, one of which was used for kerosene. And referring especially to the delivery of November 19, 1930, the appellants' counsel propounded to Mr. Azeltine the following questions:

"Q. Just what did you say to Mr. Lutterman and just what did Mr. Lutterman say to you at that time? A. Well, I hadn't been using this yellow barrel and I went and got it and said, 'I want to have some kerosene in this yellow barrel, so there wouldn't be any more danger—'

"Q. So that what? A. So there wouldn't be any danger. I told him I wasn't going to keep any more gas on the place so I just had five gallons put in the car. I think this yellow barrel was laying out in the yard. I had never used it before. I opened up the bung and knocked the rust out. I had it there for the purpose of putting kerosene in it for the house and tractor."

Following the foregoing cross-examination, the appellee went into the transaction of October 8th, and it then developed that Azeltine discovered something wrong in the delivery of the kerosene and gasoline purchased on October 8th, and called Mr. Lutterman; that Mr. Lutterman immediately went out to the Azeltine farm and said that he had switched the barrels over, and he then put some kerosene in a red barrel and marked the ticket kerosene and tied it on the nozzle. Azeltine testified that Lutterman said he had put kerosene in the gasoline barrel and gasoline in the kerosene barrel, and when he came out, "I got some kerosene and had him put it in a barrel and mark it for house use. I at no time put gasoline from any of the gasoline tanks or barrels into this three gallon can." He testified further on cross-examination:

"When he came out at that time just after October 8th, we arranged to mark the gas barrels so I would know which the kerosene barrel was and which the gasoline barrel was. I had been buying both gasoline and kerosene and having it put in these red barrels and the barrels were kept there for that purpose."

We have set out quite fully the testimony in reference to the

purchase and delivery made on October 8, 1930, preceding the delivery in question in this case, for the reason that the appellant complains that it was error to permit the introduction of the testimony in reference thereto, as we have quoted above. The testimony of Azeltine in reference to the switching of the barrels at the time of the October delivery was denied by Lutterman.

At the close of the testimony a motion was made by the defendants for a directed verdict which was overruled by the court, and the case was submitted to the jury and a verdict returned for the plaintiff for $6,500, upon which judgment was entered. Exceptions to instructions and motion for new trial were then filed which were overruled, and defendants appeal.

More than fifty errors are assigned by appellants, upon which they base their right to a reversal. It will be impossible to notice all of them in this opinion and keep within a length justifying its publication. We have, however, carefully examined each and all of the errors assigned, together with the many divisions thereof, but will only refer in this opinion to the more important ones, and the ones that seem to be the most urgently insisted upon by the appellants.

Appellants contend that the court erred in giving to the jury instruction No. 13, and by referring therein to the fact that the Carlyle Life Tables show that a woman twenty-four years of age has an expectancy of life of something over thirty-eight years; the objection to the instruction being that the court assumed that the Life Tables were in evidence, while the record shows they were not, and that there was no evidence upon which the court could base the statement as to the expectancy of life as shown by the mortality tables. The mortality tables were not in the record, but counsel for appellant at the trial dictated the following into the record:

"Mr. Lundy: At the request of the plaintiff the defendant concedes that the Carlyle Life Table, as it is known, shows the expectancy of the life of a woman practically twenty four years of age to be 38.59 years."

The court, in the instruction assailed, said to the jury:

"The testimony shows * * * that, according to what is known as the Carlyle Life Tables, the expectancy of life of a person approximately twenty four years of age is 38.59 years."

· · `This was in exact accord ·with the appellants' admission of record. Any fact bearing upon the issues involved may be admitted ·`by counsel and may be treated as in evidence, the same as if established by clear and undisputed proof. Jones on Evidence (3d· Ed.) p. 386.

In ·State v. Wilson, 166 Iowa 309, 144 N. W. `47, `53, 147 N. W. 739, this court used the following language:

·"It is elementary that admissions made in the course of judicial proceedings are substitutes for and dispense with actual proof of facts. * * *`. The court might well have assumed the fact so admitted as proved."

See, also, Beems v. Railway Company, 67 Iowa 435, 25 N. W. 693; Croft` v. Railway Company, 134 Iowa 411, 109 N. W. 723; Clark v. Railway Company, 162 Iowa 630,· 144· N. W·.332, Ann. Cas. 1916B, 457. · · ·

·It is· true that this court has not taken judicial notice of the contents of the Life Tables; however, such is not the situation in ·this record. The appellants in their ·concession in the record ·obviated the necessity of the introduction of the Life Tables, and the opposing counsel were not compelled to offer or introduce the Life Tables, and the court was warranted in assuming that they were in evidence, by the concession, without their formal introduction. ·We ·conclude there is no merit in appellants' contention at this point.

 The next alleged error which we will notice is `that the ·court erred in permitting the examination of Mr. Azeltine in ref- ·erence to the sale and delivery of October 8, 1930. We do not think there is any merit in this contention of the appellants. ·Our statute, section 11272, provides that when a part of an· act,· declaration,· or conversation is given in evidence by· one party, the whole on the subject may be inquired into by the· other. The incident and circumstances of the October 8th delivery were ·inquired ·into by the appellants in the cross-examination of the witness Azeltine. It may be true that the incident in question had nothing to do with the· negligence upon which plaintiff was basing his right to recover, but the defendants opened the inquiry themselves with no apparent reason therefor. Indeed, it might be said that the appellants made the witness their own for the purpose of inquiring into the circumstances óf prior deliveries, and the re-examination might be held to be cross-examination. Having gone into the matter under consideration, the

appellants cannot be heard to object to the same line of testimony or the further exploration of a field which they have opened. Walker v. Stannis, 3 G. Greene, 440; Spaulding v. Railway, 98 Iowa 205, 67 N. W. 227, and cases therein cited.

The appellants strenuously urge error in the giving by the court of instruction No. 6. Instruction No. 6 as given by the court was as follows:

"It appears in this case without dispute that the defendant, George Lutterman, was, during the times involved in this case, an employee and agent of the defendant, Skelly Oil Company.

"You are instructed that in so far as this case is concerned, if the defendant Lutterman was negligent in the respect charged in the plaintiff's claim, such negligence would be chargeable to the defendant Skelly Oil Company. In other words, if the defendant Lutterman was negligent in the respect claimed by the plaintiff such negligence would be the negligence of the defendant Skelly Oil Company.

"Not only would the defendant Skelly Oil Company be chargeable with the claimed negligence, if any, of the defendant Lutterman, but the Oil Company would also be chargeable with the negligence, if any, of any of its officers, agents, or employees while acting within the scope of their employment. The defendant Lutterman, however, is answerable in this case only for his own negligence, if any there was.

"If you find that plaintiff is entitled to recover against the defendant Lutterman then and in such event plaintiff would also be entitled to recover against the Skelly Oil Company. It does not necessarily follow, however, that in the event the plaintiff is entitled to recover against the defendant Skelly Oil Company that he would also be entitled to recover as against the defendant Lutterman. Before plaintiff can recover as against either defendant he must prove by a preponderance of the evidence among other propositions that such defendant was negligent in the respect charged in the plaintiff's claim."

The particular objection urged against this instruction is the third paragraph thereof. This paragraph contains a correct general statement of the law, but it was unnecessary to include it in the instruction quoted, and its inclusion therein cannot be approved. However, in instructions No. 4 and No. 5, the court specifically instructed

that to entitle the plaintiff to recovery he must prove by a preponderance of the evidence each of the following: (1) That the defendant George Lutterman was negligent in the respect charged by plaintiff in his claim and submitted to you in these instructions; (2) that such negligence was the approximate cause of the death of Garnet Azeltine; (3) that Garnet Azeltine was not guilty of any negligence causing or contributing to cause her injury and death; and (4) that as a result of the death of Garnet Azeltine her estate suffered pecuniary loss, and also that if the jury finds plaintiff entitled to recover against George Lutterman, plaintiff will also be entitled to recover against the Skelly Oil Company. In instruction No. 1 the court limits the claim of negligence to the sale and delivery of November 19, 1930, and in instruction No. 7 the court told the jury that:

"The plaintiff makes but a single charge of negligence against the defendants, and in considering whether the defendants, or either of them, were negligent you will consider no other claimed act of negligence on the part of either defendant.

"The respect in which plaintiff claims that the defendants were negligent is that they negligently proceeded to deposit in a yellow drum thirty gallons of what purported to be kerosene but which in truth and in fact was a dangerous mixture.

"With reference to this charge of negligence, you are instructed that the defendants and each of them were obliged under the law to act as reasonably prudent and careful persons under the same or like circumstances, and any failure so to act in respect to this charge of negligence would constitute negligence."

The court then proceeds to call the jury's particular attention to the sale and delivery of November 19, 1930, and to consider only whether the defendants or either of them were negligent at the time of such sale and delivery, as alleged in plaintiff's petition. The court then proceeds properly to define proximate cause, negligence, and contributory negligence. It is our conclusion that there was no error in the giving to the jury of instruction No. 6.

Complaint is also made by the appellants to the giving of instruction No. 10, which instruction is as follows:

"Further in regard to the question of contributory negligence, you are instructed that under the law of this state where a human being is killed by accident and there is no eye-witness and no ob-

tainable direct evidence of the conduct or actions of the decedent immediately prior to and at the time of the accident, the law indulges the inference that the instinct of self-preservation or the love of life was such as to prompt him to exercise ordinary care for his safety. This inference is not conclusive but is a matter to be considered by the jury in connection with all the evidence in the case, and this inference is not to be indulged in where there is direct evidence obtainable as to the person's conduct at and shortly prior to the time of the accident, and in any event is only to be considered in connection with the facts and circumstances as shown in evidence.

"So in this case, if you find that there is an absence of any obtainable direct evidence as to what Mrs. Azeltine did or failed to do by way of precaution at and immediately prior to the accident in question, and no eye-witness as to the manner in which the said Mrs. Azeltine was conducting herself just prior to the time it is claimed she was injured, then you have a right to infer that she was exercising that caution which a person of ordinary care and prudence would exercise under like circumstances, unless the facts and circumstances shown in evidence on the trial of this case negative such inference, in which case such inference would not exist and you should give no consideration thereto."

The objection to the above-quoted instruction is in the reference by the court to the inference that may be drawn where there is no eyewitness to an accident. The inference under such circumstances, which the law indulges, is that the instinct of self-preservation is such as to induce ordinary care and caution for one's own safety. Of course, it is elementary that such inference cannot be indulged in the event there are eyewitnesses to the occurrence or accident. The court properly told the jury that such inference in the instant case was not conclusive, but is a matter to be considered by the jury in passing upon the question as to contributory negligence of the person injured. In this case the record shows that there was no eyewitness at and immediately prior to the time of the explosion and the court did not err in instructing the jury in reference to the inference to be indulged under such circumstances. Ellis v. Oil Company, 133 Iowa 11, 110 N. W. 20; Carlisle v. D. & M. Railway Co., 178 Iowa 224, 159 N. W. 667.

The next contention of appellant which we will discuss is that the trial court adopted and submitted to the jury as a basis of

recovery the so-called "Wife and Mother Statute" appearing in the 1927 Code as sections 10462 and 10463, and that these sections were repealed, and the measure of recovery as provided therein abrogated, by the enactment by the 44th General Assembly of chapter 214, which now appears in the Code as section 10991-d1. It will be borne in mind that the accident involved in this case occurred January 2, 1931, and the plaintiff's petition was filed January 30, 1931. Chapter 214 of the Acts of the Forty-fourth General Assembly did not become effective until July 4, 1931. Subdivision 1, section 63, chapter 4 of the 1931 Code, provides:

"The repeal of a statute does not revive a statute previously repealed, nor affect any right which has accrued, any duty imposed, any penalty incurred, or any proceeding commenced, under or by virtue of the statute repealed."

Section 64, chapter 4, provides:

"The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. Its provisions and all proceedings under it shall be liberally construed with a view to promote its objects and assist the parties in obtaining justice."

Just what the effect of the repeal of sections 10462 and 10463 and the enactment of section 10991-d1 is, we do not deem it necessary to decide at this time. In view of the provisions of chapter 4 of the Code above quoted, we are constrained to hold that the repeal of the old sections and the enactment of the new does not in this case avail the appellants anything. Section 63, which we have quoted, constitutes a standing saving clause which, in effect, accompanies all repealing statutes. Such was the holding of this court in State ex rel. v. Shepherd, 202 Iowa 437, 210 N. W. 476. In this case we said, speaking through Justice Evans, and referring to the identical question at issue here:

"Its very purpose was to save the necessity of the burdensome formality of attaching an identical saving clause to all repealing legislation. This repealing statute, therefore, is not wanting in a saving clause."

In that case we held that if any rights had accrued to any person under the repealed statute and prior to the enactment of the

substitute, that such right was fully preserved by section 63, chapter 4 of the Code. We further held that such right having accrued, it was enforceable at any time, and that the accrual of the right was not dependent upon its enforcement; that the accrued right remained though its enforcement was delayed; and that such right was in no manner affected by the repeal of the statute.

This ruling was followed and re-announced in the case of Thomas v. Disbrow, 208 Iowa, 873, 224 N. W. 36, 37, in which we had before us the so-called "Reckless Driver Statute." In that case the trial court instructed the jury that the appellant's right of recovery must be under the amendment or amended statute. The amendment in question in that case became effective after the accident occurred and while the action for damages was pending, the same situation as in the case at bar. We reversed a judgment in that case by reason of such instruction of the court, and speaking through Justice Faville, we said:

"The question for our determination is whether or not the statute in question, which was adopted by the legislature after the injury and while the action was pending, is applicable to the instant case. Was the statute retrospective or prospective? It is a general rule of construction that statutes are to be construed as having a prospective operation only unless the purpose and intention of the legislature to give them a retrospective effect is clearly expressed in the act, or necessarily implied therefrom."

Citing Bartruff v. Remey, 15 Iowa 257; Knoulton v. Redenbaugh, 40 Iowa 114; State ex rel. v. Telephone Company, 175 Iowa 607, 154 N. W. 678, Ann. Cas. 1917E, 539; Foster & Son v. Bellows, 204 Iowa 1052, 216 N. W. 956.

We have heretofore announced the rule for the proper basis for assessment of damages in the case of the death of a married woman. Bridenstine v. Electric R. Company, 181 Iowa 1124, 165 N. W. 435. That is, to show among other things her capacity, ability, and efficiency in the discharge of her duties as wife and mother, along with her age, life expectancy, and health. These facts and others were shown by the evidence in the record before us and furnished a proper basis for the assessment of damages as made by the jury. While the verdict returned was a comparatively large one, the basis of recovery was properly submitted to the jury, and with its finding and judgment we are not disposed to interfere.

We will not further extend this opinion in a discussion of the many errors which we have not specially noticed herein, all of which we have carefully considered and in none of which do we find any error upon which a reversal could be predicated. The disputed questions of fact were fairly and properly submitted to the jury by the instructions of the court, and by its verdict the jury found against the defendants-appellants on all such disputed questions. We find no error in the record, and an affirmance necessarily follows.—Affirmed.

CLAUSSEN, C. J., and STEVENS, KINDIG, MITCHELL, and KINTZINGER, JJ., concur.