**STANDARD OIL CO. v. LYONS et al.**
**SAME v. PRIESTER CONST. CO.**

Nos. 12275, 12276.

Circuit Court of Appeals, Eighth Circuit.

Oct. 22, 1942.

Rehearing Denied Nov. 14, 1942.

F. J. MacLaughlin and Wayne G. Cook, both of Davenport, Iowa (Cook, MacLaughlin & Blair, Lane & Waterman, C. D. Waterman, and James J. Lamb, all of Davenport, Iowa, on the brief), for appellant.

Curtis Bush, of Davenport, Iowa (Bush & Bush, of Davenport, Iowa, on the brief), for appellees Lena Lyons and Employers Mut. Liability Ins. Co.

Walter M. Balluff, of Davenport, Iowa (Bernard F. Balluff and Balluff, Harbeck & LeGrand, all of Davenport, Iowa, on the brief), for appellee Priester Const. Co.

Before GARDNER, WOODROUGH, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

Appellant, Standard Oil Company, prosecutes these two appeals from judgments against it in actions to recover damages alleged to have been caused by its negligence. The parties will be referred to as they were designated in the trial court. In No. 12,275, plaintiff Lena Lyons sued as administratrix of the Estate of Iliff Eugene Lyons, her deceased husband, to recover damages caused by his death. In No. 12,276, plaintiff, Priester Construction Company, sued for damages caused to property. The actions were consolidated for purposes of trial and are presented here on consolidated record.

In 1939, the city of Rock Island, Illinois, made certain improvements to its water system. A general contract was let to plaintiff Priester Construction Company, of Davenport, Iowa. The plans called for the construction of four similar circular water tanks, which in appearance resembled an open kettle covered by a dome-like lid. Each tank was built underground so that the dome rested on the upper rim of the sidewalls, just above the ground level. Each tank was 135 feet in diameter, the sidewalls were 25 feet in height, and the distance from the floor to the center of the dome was 38 feet. There were two openings in each tank, where the sidewall and dome met, this opening being 4x4 feet. The specifications as originally prepared required that the floor and a part of the interior sidewalls of these water tanks be waterproofed with a product called Ironite. The waterproofing work was sublet to C. Holmquist and Company. The subcontractor began to apply Ironite to the first of these tanks, but that product was found to be unsatisfactory. The specifications were then changed and Korite primer coat, manufactured and sold by defendant, was designated as the waterproofing compound to be used. The subcontractor then purchased from the defendant the quantity of the product needed for waterproofing the tanks. Prior to August 28, 1939, three of the tanks had been waterproofed with this product. On that day, the Korite primer coat was being applied to the fourth tank, when an explosion occurred. Decedent Lyons, as foreman in charge, was working in the tank at the time and he suffered injuries which resulted in his death. C. Holmquist and Company had contracts and performed work in Iowa and Illinois.

and as required by the laws of those states had insured its liability to employees under the Workmen's Compensation Act of both states. Lyons was survived by his widow and a stepdaughter, both of whom were dependent upon him for their support. Following his death, his dependents commenced proceedings before the Iowa Industrial Commissioner for the recovery of compensation under the Iowa Workmens' Compensation Act, and the Commissioner made an award of compensation in favor of the widow and stepdaughter and against C. Holmquist and Company and its insurance carrier for the compensation and other benefits provided by the Iowa statute. Defendant Standard Oil Company was not a party to that proceeding.

Plaintiffs separately charged defendant with negligence in selling the primer coat without giving notice to C. Holmquist and Company and the decedent, Iliff Eugene Lyons, or either of them, of the dangerous character of the product, when it knew, or should have known, that it was a dangerous, volatile, inflammable, and explosive product, imminently, inherently and essentially dangerous in itself to human life and property, and when it knew, or should have known, the purposes for which it was to be used.

Defendant put in issue by proper denial the allegations of negligence, and by a special plea in bar in the Lyons case, No. 12,-275, pleaded that decedent Lyons entered into his contract of employment with C. Holmquist and Company in Rock Island County, Illinois, and that his personal representative had no right to maintain an action for damages at common law against defendant under the laws of Illinois, but such right of action, if any, was transferred to the employer of said decedent. The court construed this as a plea in bar and proceeded to hear that issue prior to trial of the case on its merits. After hearing the evidence the court held that the contract of hire had been made in the State of Iowa and that plaintiff Lena Lyons was entitled to maintain this action. At the close of all the testimony defendant moved for a directed verdict in each case. These motions were overruled and the case was submitted to the jury on instructions to which no exceptions are here urged.

The jury having returned verdicts in favor of each plaintiff, defendant prosecutes these appeals and seeks reversal on the ground that (1) the court erred in overruling its plea in bar in case No. 12,275,

and (2) the court erred in overruling defendant's motion for a directed verdict in each case.

We shall first consider the contention that plaintiff Lena Lyons, administratrix, could not maintain the action. This contention is bottomed on the assumption that the contract of hire between the decedent and C. Holmquist and Company was an Illinois contract and that under the statutes of that state the cause of action was transferred to the employer. Illinois Revised Statutes 1937, Bar Assn.Ed., Ch. 48, Secs. 138–172. If the contract was an Iowa contract, the right of action against the third party tort-feasor remained in the employee, or in case of his death, his legal representative could maintain the action for damages. Sec. 1382, Code of Iowa, 1939. The Iowa law, of course, became a part of the contract of employment if it was an Iowa contract, and the Supreme Court of Iowa has held that recovery may be had under the Workmen's Compensation Act of that state even though the injury occurred outside of that state. Pierce v. Bekins Van & Storage Co., 185 Iowa 1346, 172 N.W. 191. The administratrix maintains that the contract was an Iowa contract. The evidence taken at the hearing on this issue showed that decedent had previously worked for C. Holmquist and Company. Sometimes Russell Bergstedt, who was in charge of the roofing and waterproofing work done by C. Holmquist and Company, would talk over the telephone with decedent about employment, and sometimes he would talk on the same subject with Mrs. Lyons. Mrs. Lyons testified that: "Mr. Bergstedt frequently called and sometimes he talked with Sammy, as my husband was known, and he sometimes talked with me. When he talked with me I would tell him that 'Mr. Lyons will be there,' and Mr. Lyons would go to work whenever I told Mr. Bergstedt he would be there."

Referring to the conversation concerning employment on the waterworks at Rock Island, she testified: "I recall the circumstances under which he went to work. * * * He was employed by a telephone call. Russell Bergstedt called me by telephone at about 4:00 p. m. on Friday, July 28, 1939, and I was then at the home of Mrs. Hazel Witters. She called me to the telephone. Mr. Bergstedt asked me if Mr. Lyons was through working for the Davenport Roofing Company and when I told him that he was through with that work Mr. Bergstedt then asked if I would have

Mr. Lyons 'be to work Monday morning,' and I told him that I would."

Mrs. Witters, who heard Mrs. Lyons talk over the telephone, testified that Mrs. Lyons said, "Sammy would be to work Monday morning."

Bergstedt testified that when men were employed by the company they worked wherever there was work to do, or wherever they were told to work. Lyons was a member of the Union and his hours and rate of pay were fixed and were known by both of the parties.

These conversations over the telephone took place between Bergstedt, who was in Rock Island, Illinois, and Mrs. Lyons, who was in Davenport, Iowa. If by this conversation Bergstedt simply made an offer to give decedent employment upon his reporting for work in Illinois, the offer would be accepted by the act of reporting for work and the contract would be an Illinois contract because that would be the place where the final act necessary to consummate the contract was performed. Texas Employers' Ins. Ass'n v. Moore, Tex. Civ.App., 56 S.W.2d 652; Hunt v. Jeffries, Mo.App., 156 S.W.2d 23. If, however, there was a promise for a promise, an acceptance by the offeree of the offer of employment, the contract was entered into at once. Daggett v. Kansas City Structural Steel Co., 334 Mo. 207, 65 S.W.2d 1036. In such circumstances, the place of making the contract would be the place where the offeree used the telephone. Dudley A. Tyng & Co. v. Converse, 180 Mich. 195, 146 N.W. 629; Southland Cotton Oil Co. v. Guitar, Tex.Civ.App., 3 S.W.2d 471; Cuero Cotton Oil & Mfg. Co. v. Feeders' Supply Co., Tex.Civ.App., 203 S.W. 79; Early-Foster Co. v. A. P. Moore's Sons, Inc., Tex.Civ.App., 230 S.W. 787; Bank of Yolo v. Sperry Flour Co., 141 Cal. 314, 74 P. 855, 65 L.R.A. 90.

In a contract between master and servant, formality is not essential. "It may be accomplished with few words, or may be implied from conduct without words." Pfister v. Doon Elec. Co., 199 Iowa 548, 202 N.W. 371, 374. An offer for a bilateral contract requires an acceptance by the offeree to make the contract. The effect of acceptance is to convert the offer into a binding contract. Acceptance by the offeree may be inferred from any words indicating assent to the offer. Williston on Contracts, Rev.Ed., Sec. 67. Apparently C. Holmquist and Company was

anxious to employ decedent. Mrs. Lyons testified that Mr. Bergstedt had telephoned her earlier in the week and said that he wanted "Sammy" to come to work then, but she told him he couldn't come because he was then working for Davenport Roofing Company and couldn't go until he finished his job there. Bergstedt said he would call again. Then came the telephone conversation of July 28, 1939, above referred to. We think the words used were sufficient to constitute a bilateral contract. In effect, Bergstedt asked for a promise that Lyons would be to work on Monday, and Mrs. Lyons gave him that promise.

Was Mrs. Lyons authorized to speak for and bind her husband in the matter of this contract of employment? She testified that on frequent prior occasions Mr. Bergstedt had called to employ her husband and that sometimes he talked with him and at other times talked with her. When Bergstedt talked with her she would tell him "Mr. Lyons will be there," and Mr. Lyons would go to work whenever she promised Bergstedt that he would. This is evidence of authority to make contracts such as the one in suit. Authority to act for one as his agent may be implied from the conduct of the parties, and any conduct which reasonably interpreted may lead a third person to believe that the person with whom he deals is acting for another with his consent will warrant such an implication. Restatement Law of Agency, Sec. 27. An affirmance of even an unauthorized transaction may be inferred from a failure to repudiate (Restatement Law of Agency, Sec. 94), and acquiescence by the principal in a series of acts by the agent indicates authorization to perform similar acts in the future. Restatement Law of Agency, Sec. 43(2); Federal Land Bank v. Union Bank & Trust Co., 228 Iowa 205, 290 N.W. 512. We conclude that the court did not err in overruling defendant's plea in bar. The fact that the trial court may have reached its conclusion by a somewhat different course of reasoning is not material. J. E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36.

There remains for consideration the contention that the court erred in denying defendant's motion for a directed verdict in each of the cases. The jury, having returned verdicts for the plaintiffs, resolved all conflicts in the evidence in plaintiffs' favor and we must take that view of the evidence which is most favorable

to plaintiffs. Plaintiffs were entitled to the benefit of such favorable inferences as the jury might reasonably have drawn from the evidence. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Chicago, M. St. P. & P. R. Co. v. Linehan, 8 Cir., 66 F.2d 373; Thomson v. Boles, 8 Cir., 123 F.2d 487; Chicago, St. P. M. & O. Ry. Co. v. Kulp, 8 Cir., 102 F.2d 352, 133 A.L.R. 1445. If, when so viewed, reasonable men might differ as to the facts established or as to the conclusions and inferences that may reasonably be drawn from the established facts, then the case was properly one for the jury. With this rule in mind we turn to a consideration of the evidence.

At the time of receiving his fatal injuries, Lyons was in the employ of C. Holmquist and Company, working with Heckman, Raiche and Bickford in the interior of tank No. 4, all being engaged in applying Korite primer to the interior of the tank. Bickford, the only survivor, was running the Korite primer from the barrels into pails and letting the pails down by rope into the tank where the other men were working. Lyons was operating a spray to apply the Korite primer to the floor; Heckman was working a pump which provided the compressed air for the spray, while Raiche was applying the primer with a mop. Lyons wore tennis shoes; Heckman wore leather shoes which produced a metallic click when he walked on the concrete floor of the tank; Bickford wore heavy leather shoes. Raiche was using a mop with a metal fastener holding the strands to the mop handle. The tank was empty except for a timber holding the floor drain cover tight to the floor, a flood light at the ceiling next to the ladder with a short wire running from the light to the conduit, the spray with pressure tank, and two or three buckets containing the Korite primer which was being applied. Shortly after lunch, just as Bickford was starting down the ladder, the explosion occurred. The naphtha in the Korite primer was the explosive material in the tank which was capable of causing the explosion.

The asphalt primer coat sold by defendant is a liquid containing 50 per cent asphalt and 48 per cent naphtha. It has a flash-point of about 30 degrees F. The flash-point is that temperature at which the naphtha tends to give off a gas which will flash in the presence of flame or spark. The naphtha was the solvent in the primer. Safety solvents are those which have a flash-point above 110 degrees F., while solvents which have a flash-point below 110 degrees F. are regarded as highly inflammable and relatively dangerous. When the gas given off by naphtha constitutes 1½% to 6% of a given quantity of air, the mixture will explode in the presence of a spark or flame having a temperature of 700 degrees F. Above or below that degree of saturation, the mixture is not explosive. An expert chemical engineer testified that the primer was a dangerous substance. Just what particular action or thing caused the explosion is not definitely disclosed by the evidence. A spark from the contact of the metal end of the mop or a spark from the sliding of the metallically fastened sole of a shoe, or something of that character, must have occurred. It is, of course, possible that some workman may have attempted to smoke, but as all the workmen are dead, we must assume that they were in the exercise of proper care.

This was the first use of defendant's product by C. Holmquist and Company. Defendant was fully advised from the start of the kind of work for which the primer was to be used. It was delivered in barrels by the defendant at the tank where it was being applied. The barrels contained no warning label as to danger in its use or application. The barrels had labels identifying the product as a primer coat and the name of the manufacturer. They were a muddy, dusty red in color.

The parties do not seriously differ in their contentions as to the applicable law, but it is urged by defendant that it gave such notice or warning as under the circumstances disclosed it was required to give. Defendant was the manufacturer and seller of this dangerous product. The product was so manufactured that it was ready for immediate use. It was inherently dangerous. The jury having found that the danger was not known to C. Holmquist and Company, the purchaser, nor to the plaintiff, and not being patent, it was incumbent upon the defendant to give warning of the danger in its use, if that danger could not be discovered by a reasonable inspection. If, under such circumstances, the warning or notice was not given, defendant would be liable for personal injuries received by one who used the product in an ordinary and anticipated manner. Chapman v. Pfarr, 153 Iowa 20, 132 N.W. 957; Ellis v. Republic Oil Co., 133 Iowa 11, 110 N.W. 20; Huset v. J. L

Case Thresh. Machine Co., 8 Cir., 120 F. 865, 61 L.R.A. 303; Employers' Liability Assur. Corp. v. Columbus-McKinnon Chain Co., D.C., 13 F.2d 128; International Mercantile Marine Co. v. Fels, 2 Cir., 170 F. 275, 18 Ann.Cas. 18; Genesee County Patrons F. R. Ass'n v. L. Sonneborn Sons, 263 N.Y. 463, 189 N.E. 551; Standard Oil Co. v. Tierney, 92 Ky. 367, 17 S.W. 1025, 14 L.R.A. 677, 36 Am.St.Rep. 595; Thornhill v. Carpenter-Morton Co., 220 Mass. 593, 108 N.E. 474; Kentucky Independent Oil Co. v. Schnitzler, 208 Ky. 507, 271 S.W. 570, 39 A.L.R. 979. There is no evidence that any warning was given by defendant of the dangerous nature of this primer substance at the time of its sale to C. Holmquist and Company, but it was claimed that defendant's industrial salesman, Wiegand, later gave such notice and warning. He went to a conference held at tank No. 1, called because the engineer in charge thought the primer coat was too thin and that it was not drying properly. Wiegand testified that in conversation with Bergstedt, the roofing supervisor of C. Holmquist and Company, he told him there was naphtha in the primer. He, with Bergstedt, went down into this tank No. 1, and, apparently, with complacency, Wiegand observed that some of the primer coat was standing on the floor in puddles. There was a decided naphtha odor, and he noticed "some open flames or torches in the tank," and he called Bergstedt's attention to the burning torches and told him they shouldn't have them in the tank because the material had naphtha in it and was dangerous. According to his testimony he told Bergstedt, Ward, engineer of Public Works Administration in charge of inspection of federal projects at Rock Island, Rexine, resident engineer, McIntosh, general construction superintendent, and Priester, president of the Priester Construction Company, that there was naphtha in the primer. The use of torches in the tank, he said, was dangerous, "and it was generally agreed that the use of torches would be discontinued. Someone in the group said something about not wanting to blow the lid off the tank or kill the men." It was in this conversation that notice of the dangerous nature of the product is claimed to have been given. I. P. Patch, the salesman who sold the product, testified that in the first week in July, 1939, he told Coyne, who did business at the Federal Engineering Company, Lehman and Rexine of the Federal Engineering Company, and Priester and Covemaker of the Priester Construction Company, "that it would be necessary to use a primer coat which was cut back with a highly volatile substance in order to apply it in liquid form * * *." A volatile substance is that which passes off readily in the form of a vapor. New Century Dictionary. Expert testimony was to the effect that volatility is evaporation. Ammonia is the "volatile alkali."

Before this conference with Wiegand, torches were used to dry the tank floors. The evidence shows that after that their use was discontinued, but there is evidence that this discontinuance was because the torches were burning up the oxygen from the air to such an extent that it made it impossible for the men to work in the tank. Covemaker, the superintendent in charge for the Priester Construction Company, testified that at the conference at the first tank nothing was said about torches, and that he was sure he was smoking during the conference and no representative of defendant told him that the primer or its fumes were inflammable, volatile or explosive, or that the primer contained 48 per cent naphtha which had a flashpoint of less than 50 degrees F. W. A. Priester, president of the Priester Construction Company, testified that nothing was said by Wiegand about naphtha in the primer at this conference. Bergstedt, on direct examination, testified that no agent or representative of the defendant at any time told him whether or not the primer was volatile, explosive or inflammable and that he had only the one conversation with Wiegand. On cross-examination he testified that he learned there was naphtha in the primer but he could not state whether that was before the explosion or after. Ward testified that Wiegand said nothing to him about the primer coat being cut back with naphtha; that he did not tell him a thing as to the content of the cutback, and he said nothing to him about removing any torches from the tank, and "he did not tell me that the primer coat was dangerous."

In so far as there was any contradiction or inconsistency in this testimony, that went to the weight of the testimony or the credibility of the witness, and the jury has determined all conflicts in favor of the plaintiffs. As said by the Supreme Court of Iowa in Reinwaldt v. Hulsebus, Iowa, 188 N.W. 11, 12, "It is needless to say again that contradictions brought out on cross-examination, and otherwise, and

other matters bearing upon the credibility of the witnesses, are for the jury."

Bickford, a fellow employee of the deceased, and the only survivor of the workmen in the tank at the time of the explosion, testified that no one told him at any time that the primer was volatile, inflammable or explosive, and he heard no one so advise Lyons, Raiche or Heckman, who were working in the tank with him and who were killed in the explosion.

■ Davis, foreman for C. Holmquist and Company, testified that after the conference at which Wiegand was present, Bergstedt told him that the primer coat contained naphtha and not to allow the torches to burn in there and there would be no fire in there, and Davis told the men not to smoke in there. They were then working on tank No. 1. Deceased was working with him at the time. Lauer, a fellow worker of Lyons, testified that after the torches were taken out of the tank, Bergstedt and Davis told them not to smoke in the tank. Donald Hedges also testified that Davis said the men had to quit smoking and to keep fire away. Peter Froelich testified that he worked under Lyons in the second tank to be waterproofed. Lyons told him there was to be no smoking in the tank. George Kallenberger testified that he went to see Lyons when he worked in the second tank and Lyons told him "about not being allowed to smoke in the tank." This evidence clearly tends to corroborate Wiegand in his statement that he warned of the danger from the naphtha in the primer, but it does no more than raise an issue of fact along with other evidence as to whether or not notice or warning was given. That was the controlling issue of fact to be decided by the jury. There are numerous contradictions and conflicts in the testimony of the various witnesses which might well have been urged upon the jury and doubtless were, but they can not be given controlling effect here. The product Korite primer was a dangerous substance, and it was the duty of the defendant to give adequate warning to plaintiffs with reference to its use in the underground tanks. The mere fact that the substance was known to contain naphtha was not, without more, sufficient warning. The content of naphtha may have been so small as to render the product practically non-explosive. The torches were being used to dry the primer. The jury may well have believed that the discontinuance of their use was advised because they were burning up the oxygen from the air and made it difficult for the men to work in the tank. They were suffering from nausea, watery eyes, and other discomforts. Wiegand's actions while in tank No. 1 are not impressive as a warning of imminent danger. He manifested no alarm at the use of the flaming torches, but according to his own version calmly advised a discontinuance of the practice. On this issue we think the verdict of the jury is sustained by substantial evidence.

■ The issue of contributory negligence can not be said to present a question of law. It was clearly a question of fact to be submitted to the jury, and we assume, in the absence of the instructions, that the issue was properly submitted to the jury and the jury's verdict is conclusive.

The judgments appealed from are therefore affirmed.

As to the plea in bar, WOODROUGH, Circuit Judge, concurs in the result.