## In re PARKER–YOUNG CO.
### No. 4069.

District Court, D. New Hampshire.
Aug. 13, 1936.

966

Frank Barber, of Brattleboro, Vt., and George Pike, of Lisbon, N. H., for Parker-Young Co.

Carl Jones, of Demond, and Woodworth, Sulloway & Jones, of Concord, N. H., for preferred creditors.

MORRIS, District Judge.

This case comes before the court on the debtor's petition for confirmation of the debtor's plan filed March 11, 1936, which was duly submitted to the stockholders for their consideration resulting in its acceptance by both preferred and common stockholders. At the hearing before the court it was disclosed that more than two-thirds of the preferred stockholders and an overwhelming majority of the common stockholders had voted in favor of the plan, and the question presented is whether it is fair and equitable and is feasible.

In brief the plan provides that all the assets of the debtor corporation, both real and personal, now held by the trustee, shall be transferred to the debtor, upon the debtor's assuming and paying all fees, costs, and expenses of administration allowed by the court and the current liabilities, secured and unsecured, of the trustee. Upon the assumption of payment of such expenses and liabilities incurred by the trustee, he will be released from all liability with respect to all obligations assumed or paid by him. The plan further provides for the reduction of the outstanding stock, both preferred and common, of the debtor in the following proportions:

Preferred stockholders will receive, upon surrender of stock certificates, one share of new 5 per cent. cumulative preferred stock of the par value of $100 for each four shares of preferred stock now outstanding. 5,927 shares of new preferred stock will be required for distribution among the preferred stockholders and all outstanding preferred stock of the debtor will be surrendered and canceled, including all rights to accrued dividends thereon unpaid. No other preferred stock will be issued.

The distribution of common stock will be as follows: All common stockholders will surrender their stock certificates, and will receive in return for each ten shares of common stock so surrendered one share of the common stock of the debtor. 5,-812.5 shares of stock will be required for distribution among the present existing common stockholders. The remaining shares of common stock so surrendered to the debtor will become treasury stock and shall be restored to the status of authorized but unissued stock and may thereafter be issued under the authority of the directors for cash at not less than $5 per share, for the purpose of providing the debtor with additional working capital.

Stockholders entitled to receive fractions of shares of new preferred stock or of common stock will not be entitled to dividends, but may exchange or acquire other fractional parts to make up a full share of either class. The new preferred stock will be entitled to 5 per cent. cumulative dividends from July 1, 1938, payable quarterly, commencing October 1, 1938. It is provided that such preferred stock may be called on forty days' notice on any quarterly dividend day at par plus accrued dividends.

No dividends shall be paid on the common stock until all dividends have been paid on the preferred stock for two successive dividend periods.

The common stock will have voting rights unless the debtor shall have passed six quarterly cumulative dividend periods on the preferred stock. In that event the preferred stockholders shall assume such voting rights which will remain with them until all prior dividends have been paid in full. Provision is made for the mortgaging, pledging, or encumbering the property of the debtor to secure loans for the purpose of financing existing obligations in such sums as the board of directors may authorize. Provision is made for changes in the charter, articles of association, and by-laws to meet the requirements of the proposed changes in the corporate set-up.

The plan recites that provisions have already been made by the debtor for paying its bonded indebtedness on a basis of 37½ cents on a dollar of the face value of the bonds and that the required number of creditors have assented to accept such payment in full discharge of such bonds. The plan further recites that the payment of all outstanding unsecured debts of the corporation on the basis of 20 cents

on a dollar of such indebtedness has been provided for.

Such, in the main, are the provisions of the plan now before the court for confirmation.

A brief historical review of the proceedings before the court from their inception is necessary for a correct understanding of the present status of the case.

The debtor is a state of Maine corporation doing business at Lincoln in the county of Grafton, state of New Hampshire. On or about September 1, 1933, the corporation went into the hands of a receiver appointed in the superior court in the county of Grafton, state of New Hampshire. On or about September 1, 1934, a petition for reorganization under the provisions of 77B of the Bankruptcy Act (11 U.S.C.A. § 207) was filed by certain creditors of the debtor in this court. Numerous hearings have been held from time to time on different questions arising in the course of the proceedings. In the winter of 1934–1935 two plans for reorganization were submitted to both creditors and stockholders, one on behalf of a bondholders' protective committee and the other on behalf of the debtor corporation. Neither of these plans received the requisite number of acceptances to permit of confirmation by the court under the provisions of 77B (e) (1), 11 U.S.C.A. § 207 (e) (1). On the 21st day of December, 1935, another plan was presented by the debtor and sent out, which likewise failed to receive the requisite number of acceptances. On the 24th day of January, 1936, a partial plan of reorganization providing for the payment of the bonded and unsecured indebtedness of the debtor corporation was accepted by the requisite number of creditors and stockholders and received confirmation by the court February 28, 1936. All such indebtedness has been liquidated in accordance with the provisions of the plan then sent out. The secured indebtedness has been liquidated by the trustee paying to the bondholders 37½ cents on a dollar of the face of their bonds, and the unsecured indebtedness has been liquidated by the payment of 20 cents on a dollar of the face value of the claims. Thereafter the debtor filed with the court the present plan for a reduction of its capital stock, which plan follows the same general methods as had been attempted in prior plans without objection on the part of any of the stockholders.

At the time and place appointed for a hearing on the confirmation of the debtor's plan, counsel appeared in favor of such confirmation and a minority block of preferred stockholders appeared in opposition. The matter was heard orally, and elaborate briefs have been filed by opposing counsel.

Counsel for the minority stockholders contend that the plan does not involve the exercise of any bankruptcy power and that even if it does, it should be rejected because it does not constitute a proper exercise of that power. It is further objected that the plan does not include any provision for modifying or altering the rights of creditors; that it does not provide for the payment in cash of all costs of administration; that it does not provide adequate means for the execution of the plan as required by section 77B, subdivision (b) (9) of the Bankruptcy Act (11 U.S.C.A. § 207 (b) (9); that the plan is not offered in good faith; that it is not fair and equitable, in that it discriminates unfairly in favor of the common stockholders as against the preferred stockholders; and that it is not feasible.

The constitutionality of the act has been settled by the Supreme Court of the United States in the case of Continental Illinois N. B. & T. Co. v. C., R. I. & P. R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L. Ed. 1110, and the court's attention is called to the fact that the opinion of the Supreme Court is grounded upon the premises that the action is in its general scope and aim within the power conferred by the bankruptcy clause of the Constitution; that it is simply an extension of the law of composition providing a new way by which to appropriate the property of a corporate debtor to the payment of its debts.

As I understand the point raised by counsel, it is claimed that because the plan does not in any way affect the relations between the debtor and its creditors, in other words, that the rights of creditors are not involved, therefore no provision for the submission of such a plan involving only the relation of one class of stockholders to another can be found in the language of 77B.

The claim of the debtor corporation is that this is only a part of what was originally submitted as an entire plan of reorganization, not only as between the debtor and its creditors, but between the two classes of stockholders. This issue in-

volves the question whether the plan now under consideration can be considered as a part of the original plan of reorganization.

In determining this question, it seems necessary to call attention to the fact that the original plan submitted by creditors of the corporation contained provisions exchanging bonds secured by mortgage on property of the debtor for shares of preferred stock, also provisions for the formation of a new corporation with an entirely new capital set-up.

At about the same time the debtor corporation presented a somewhat similar plan of reorganization which provided for taking care of both secured and unsecured indebtedness and for a new capital set-up.

Neither of these plans received the requisite number of acceptances to carry them through. Some weeks later the debtor proposed another plan which not only involved partial liquidation of the company's indebtedness but also a new capital set-up. This third plan was not accepted. The opposing parties, the bondholders represented by a bondholders' committee on one side and the stockholders on the other, both preferred and common appeared to be deadlocked, and it became evident to the court that any plan proposed by one side would be defeated by the other side, that is, it would not receive the requisite number of acceptances to warrant its confirmation by the court. With the situation confronting the parties an agreement was reached between counsel by which the objectives to be reached under the original petition were to be deferred and a plan submitted for a vote of the creditors and stockholders which practically involved a composition offer to all bondholders of 37½ cents on a dollar of the face value of their bonds outstanding amounting to $1,500,000 and 20 cents on a dollar to the unsecured creditors whose claims approximated $93,000. The carrying out of this part of the original plan was made feasible by a series of fortunate circumstances, including an advantageous sale of corporate interests in the state of Washington, a rather fortunate sale of Florida lands, a sale of a considerable acreage of land to the federal government and the borrowing of $325,000 from a Commercial Credit Company in New York. The money derived from these several sources was set aside in a "special account" for the payment of the bonded indebtedness and un-

secured claims plus the expenses incurred by the bondholders' committee. When that plan was sent out for acceptances it was then understood that it would be followed by a further plan involving the corporate structure of the debtor corporation because it was felt that it was top-heavy and should be reduced.

It was after this series of events and efforts to reach an understanding that this plan was filed and sent out and, as it appears, it has received acceptances favorable to its adoption from the requisite number of preferred stockholders and the indorsement of practically all of the common shareholders.

It certainly seems too bad after nearly two years of futile efforts to reorganize and rehabilitate the debtor corporation to be compelled to liquidate it or dismiss the action because of the claim advanced by a minority block of dissenting preferred stockholders that because it does not involve any relation between the debtor and its creditors that therefore it is not a plan within the provisions of 77B.

I am not convinced that such dismissal is required upon the grounds advanced. Authority may be found for proceeding in successive steps to accomplish the primary and ultimate object to be gained. In re Prudence Bonds Corp. (C.C.A.2d Circuit, 1935) 79 F.(2d) 205, at pages 207, 210.

In the above-entitled case as said by Judge Hand in speaking of the objections to the submission of a series of plans to accomplish a single reorganization:

"The general objection of appellant to the plan * * * is that section 77B contemplates a complete reorganization of the debtor and not the adoption of a series of separate plans of reorganization such as the present proceeding involves. Appellant adverts to the fact that again and again the word 'plan' rather than the word 'plans' is used in the statute, and that the act nowhere in terms authorizes a series of plans. This cannot be denied, and it is probably true that Congress did not have in mind the adoption of a series of plans when section 77B was enacted."

The opinion then proceeds on the theory that being confronted by the circumstances of the particular case that a series of plans may be confirmed if they are fair and equitable. So in the instant case, confronted as the parties are with the failure of numerous plans sent out for adoption,

when it seemed as though the only resource was absolute bankruptcy and liquidation, it does not appear to the court that the plan so far transcends the provisions of the statute that it ought to be dismissed because it is one of a series, if otherwise it is found to be fair, equitable, and feasible. Certainly I cannot find that it was not filed in good faith.

A plan of reorganization, within the meaning of section 77B(b) (1, 2), title 11 U.S.C.A. § 207 (b):

"(1) shall include provisions modifying or altering the right of creditors generally, or of any class of them, secured or unsecured; * * *

"(2) May include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new securities of any character or otherwise."

The statute specifically provides for a modification of the rights of stockholders. The only limitation is that such modifications as are proposed in any plan of reorganization must be fair and equitable as between different classes of stockholders. In the instant case, the only classes to be dealt with are preferred and common stockholders.

Another contention of counsel representing preferred stockholders is that the proposed plan is not fair and equitable, in that it discriminates unfairly in favor of the common stockholders as against the preferred stockholders, and that it is not feasible, and to this extent the plan and its acceptance by a majority of both preferred and common stockholders is not in good faith. It would be presumptuous for me to find more than 400 individual preferred stockholders who voted for the adoption of the plan acted in bad faith. That contention may be summarily dismissed without further discussion.

It is contended that the controversy, so far as contained in the plan now before the court, is one wholly between the preferred and the common stockholders for control of the corporation and that section 77B of the Bankruptcy Act was not enacted for the purpose of adjusting such disputes where substantial claims of creditors are not involved.

That personalities have to a very considerable extent entered into and retarded the attainment of the beneficial results that should come from a corporate reorganization under the statute and which the statute was intended to provide is the opinion of the court. It is high time the contending factions should compromise their difficulties and start working in harmony for the rehabilitation of the corporation and the good of the community which is largely dependent on it for sustenance.

If this plan must be treated as standing alone, entirely independent of what has preceded it, I would have to agree that the statute was never intended as a means of settling disputes between warring stockholders. But as heretofore held I treat the present plan as an integral part of the proceeding which was instituted ostensibly by creditors of the debtor but which in fact was started by the bondholders' committee acting in conjunction with the then board of directors of the corporation. The entire case has been developed after a series of hearings at which it was claimed by the bondholders' committee that the entire property of the debtor was insufficient to liquidate the bonded indebtedness and that the stockholders had no financial interest therein except as to such outside property as was not covered by the indenture of mortgage. While the manufacturing plant and much of the debtor's real estate was under the mortgage, it cannot be denied that there was a very considerable value in the property which was outside the mortgage and it is the opinion of the court that it was because of these free assets that the bondholders' committee hesitated to foreclose the mortgage or press for actual liquidation.

After the unsuccessful attempts to reorganize the present corporation or to form a new one to take over the entire assets of the debtor, creditors made the composition offer hereinbefore mentioned which was accepted by the requisite number of both classes of creditors and stockholders and such debts were liquidated on a percentage basis. But in order to carry out the composition offer it was necessary for the debtor to raise a large amount of money, as has already been indicated, which was done through the medium of a Trustee appointed by the court, so that while the indenture of mortgage has been discharged it by no means follows that the entire indebtedness of the corporation has been liquidated. It has been liquidated to the extent that its physical properties are no longer subject to mortgage. The char-

acter of indebtedness has been changed, but a large indebtedness still exists to the payment of which the receivables of the corporation are pledged. Therefore, I am unable to agree with the contention of the minority preferred stockholders that the only issue in this suit, in what has been a single proceeding from the time it was first instituted, is that it involves only an adjustment of disputes between different classes of stockholders for the control of the corporation. To leave the corporation in its present temporary financial condition with its heavy interest charges payable to the Commercial Credit Company would be inviting further financial difficulty even though its debts have been materially reduced. Before the case is finally discharged, a permanent reorganization should be effected both as to finances and corporate structure.

The case started with the claim on the part of the secured creditors that they owned the entire plant under the indenture of mortgage. That mortgage having now been released, it is the claim of the minority preferred stockholders that the preferred stockholders own all the debtor's property and that the common stockholders have no interest therein.

It is certain that the entire property of the debtor is not sufficient to pay and retire the preferred stock outstanding with accrued dividends, but in order to preserve the property from liquidation and in the hope of ultimate rehabilitation and to retain it as a going concern for the good of the public, about 70 per cent. of the preferred stockholders have accepted the plan which provides for the surrender of all unpaid dividends upon the preferred stock and a percentage of such stock, allowing the common stockholders to retain an interest of little or no present value in the corporation. Such a step in the interest of retaining the property as a going concern is within the provisions of 77B. The only question is whether the majority of the preferred stockholders can impose upon the minority the provisions of a plan which the minority have not accepted.

In considering this question, it will be well to first examine the original articles of association of the debtor corporation to ascertain what rights the preferred stockholders are surrendering in the interest of keeping a valuable property in operation. Reference thereto discloses that the preferred stock of the corporation is entitled to preference in liquidation to the entire extent of the amount outstanding and that it can be called only on a basis of $115 a share; that the aggregate par value of such stock outstanding is $2,370,800, entitled to quarterly cumulative dividends at the rate of 7 per cent. per annum before any dividends can be paid on the common stock; that if, as in the present instant case, as many as four quarterly preferred stock dividends shall have accrued and remained unpaid, the preferred stock has the sole voting power except on the question of calling the preferred stock. Attention is called to the further fact that the right of the preferred stock to preferential dividends and to payment on call or liquidation cannot be suspended without the consent of all the holders of preferred stock. The cumulative dividends remaining unpaid amount at the present time to $1,071,860, so that the total preferential payment claimed by the preferred stockholders in liquidation is $3,798,280.

The going concern valuation put upon the property by appraisers appointed by the court is $1,384,573, exclusive of the interest in the stock of the Woodstock Lumber Company. The value for liquidation was set by the same board at $987,165. If we were to concede that the assets of the debtor, current and fixed, totalled $1,000,000, and that this amount would be realized on liquidation, there would have to be deducted therefrom, before any distribution could be made to preferred stockholders, the amount due to the Commercial Credit Company of $345,000 (the amount fluctuates depending on receivables); trustee's certificates outstanding of $66,000; trustee's accounts payable approximating $100,000; taxes amounting to $50,000; accrued wages approximating $20,000; and such expenses of administration as might be allowed by the court so that at the best the preferred stockholders would not receive over approximately 15 per cent. of their claims.

In examining the proposed plan and considering it with reference to the rights of the preferred stockholders reserved in the articles of association, I find that they are required by the plan to surrender 75 per cent. of the face value of their stock; the accumulated dividends thereon to July 1, 1938, the difference between 7 per cent. per annum and 5 per cent. per annum accumulative dividends, the right on call or in liquidation to receive $115 per share

and accept in place thereof $100 per share, and the voting power, and hence the control of the corporation, until six dividend periods have been passed, the right to surrender a portion of preferred stock with accumulated dividends, and the right to reduce the dividends from 7 per cent. to 5 per cent. involves no difficult legal problem. It is essentially a question for the preferred stockholders to say whether such a surrender would be made for the purpose of improving the debtor's financial condition and if a majority so vote, the minority is under the law bound to accept the reduction.

■ It is plain to the court that if the full amount of preferred stock outstanding is retained and that dividends at the rate of 7 per cent. are allowed to accumulate, the corporation can never be put on a sound, prosperous basis. This is more of a financial problem than a legal one, and I see nothing unfair or inequitable as between the different classes of stockholders in a reduction of the preferred stock to 25 per cent. of its present value and permitting the common stockholders to retain 10 per cent. of the outstanding common stock.

The surrender of the voting power to the common stockholders under present conditions presents a more difficult problem. Under present conditions, if the case were dismissed, the preferred stockholders would retain the entire voting power under the corporate set-up. It cannot be denied that such equity as there is in the property, over and above the payment of the outstanding obligations, belongs to the preferred stockholders.

In my judgment, and I so find, the plan is not fair and equitable with respect to the future voting rights of the two classes of stockholders. It is neither fair nor equitable for the preferred stockholders to surrender all voting rights under the present conditions to the common stockholders, and while I think it fair that the common stockholders should have representation on the board of directors, I think under present conditions the preferred stockholders should retain control of their senior interests in the property.

The plan provides that the corporation may mortgage, pledge, or encumber its property as security for loans for the purpose of refinancing in such sums as the board of directors may authorize. The plan does not limit the amount of the mortgage which might be placed on the property. If the preferred stockholders are bound to submit to a board of directors elected entirely by the common stockholders the right to determine the amount for which the property is mortgaged, they are surrendering their right to have a voice in the management of what is essentially their own property to a board of directors which may or may not be in sympathy with them. I think this is an unfair provision in the plan; moreover, the plan should be definite to an approximation at least, as to the amount of the mortgage which is to be placed on the property, and it should not be greater than is required for the payment of the loan of the Commercial Credit Company, outstanding trustee's certificates, trustee's current bills, expenses of administration to be determined by the court and an additional sum to provide for necessary repairs and working capital. While it may not be possible to fix definitely the amount of the mortgage to be placed upon the property, it at least can be approximated to such a degree of certainty that the preferred and common stockholders may act intelligently in voting to accept or reject a plan of reorganization.

■ Another objection to the plan is that it does not provide for the payment in cash of all costs of administration and court allowances as required by section 77B, subd. (b) (3), 11 U.S.C.A. § 207 (b) (3). This requirement of the statute is of rather difficult application because it is practically impossible for the court to determine the cost of administration until a plan has been accepted and put into operation. However, such costs may be approximated, and under the terms of the present plan I must assume that the mortgage placed upon the property, if such is the method of financing, will be in a sufficient amount to pay in cash, if required, the expenses of administration. But the act makes provision for taking care of the expenses of administration and other allowances made by the court in ways other than payment in cash, if acceptable to those who are entitled to such payments. If a plan of reorganization fails to make provisions for payments in cash of the expenses and costs of administration allowed by the court, it should provide other means which should be definitely stated.

It is said that the present plan is not feasible. It is not pointed out just why it

is not feasible, and as I have found that it is not fair and equitable in some particulars and cannot be confirmed, its practicability requires no comment.

As to whether or not any plan which may be devised can be carried out depends upon the ability to finance it.

The court is credibly informed that money is available for permanently financing the corporation, if and when the parties reach an agreement on a plan satisfactory to a majority of the stockholders and which the court can confirm as fair and equitable.

For the reasons hereinbefore stated I am unable to confirm the debtor's plan, even though mindful of the fact that a large percentage of the stockholders have accepted it.

It is therefore ordered that said plan be not confirmed as fair and equitable in so far as it affects the relations between the preferred and common stockholders.

It is so ordered.