Frank SCOFIELD, Collector of Internal Revenue, Appellant,

v.

SAN ANTONIO TRANSIT COMPANY, Appellee.

No. 14784.

United States Court of Appeals Fifth Circuit.

Aug. 5, 1954.

Rehearing Denied Feb. 18, 1955.

150

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., Davis W. Morton, Jr., Asst. Atty. Gen., Hilbert P. Zarky, Sp. Asst. to Atty. Gen., for appellant.

Robert F. Ritchie, Robert Allan Ritchie, Dallas, Tex., Leslie Byrd, San Antonio, Tex., Lang, Byrd, Cross & Ladon, San Antonio, Tex., Goggans & Ritchie, Dallas, Tex., for appellee.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and DAWKINS, District Judge.

DAWKINS, District Judge.

The Collector has appealed from an adverse judgment of the District Court in the taxpayer's suit for recovery of alleged illegally collected income, declared value excess profits and excess profits taxes for the fiscal year ending May 31, 1943.

The pertinent facts (stipulated in detail to the trial court) are as follows: Smith Brothers Properties Company, a Texas corporation (hereinafter called the old corporation) owned certain realty in San Antonio upon which it constructed buildings for its own use and for lease to others. Among the buildings it owned was the Smith-Young Tower building (hereinafter called Tower building) which it built in 1928 at a cost of $2,070,709.09, financed by first mortgage

bonds in the amount of $1,900,000. A first mortgage deed of trust was executed to secure the payment of the bonds and interest coupons, whereby the property was conveyed to trustees.

By the end of 1930, the old corporation owned seven or eight business properties in San Antonio, and owed considerable debts secured by various other indentures against its realty. For the purposes of this appeal the entire indebtedness may be categorized into two groups of debts: (1) the bonded indebtedness on the Tower Building, and (2) the bonded and otherwise secured debts relating to other properties, taxes and unsecured claims.

A protective committee was formed by the Tower building bondholders and was vested with legal title to the bonds through the use of certificates of deposit. In November, 1931, the trustees named in the Tower building deed of trust declared all the bonds secured thereby due and payable; and in January, 1932, these trustees filed suit against the old corporation, seeking recovery of the entire debt due on the bonds, foreclosure of the bond lien and the appointment of a receiver. A receiver was appointed; but this did not vest him with title to the Tower building, which was still in the old corporation. Answer was filed by the latter with a cross-claim alleging usury.

In the latter part of 1932, or early 1933, the old corporation defaulted on its other secured debts, and all of its other properties were taken over by one Gill, agent for Massachusetts Mutual Life Insurance Company (hereinafter called Massachusetts), the holder of second and third mortgage notes against some of the properties. Gill was not judicially appointed, and the procedure employed by this group of creditors appears to have been entirely extra-judicial at that time. At any rate, the properties were in the hands of the creditors and were operated by Gill separately from the Tower building, then being operated by the receiver appointed in the trustees' foreclosure suit.

There was some maneuvering in the foreclosure suit, with respect to the defense of usury, as well as the asserted personal liability of some of the stockholders of the old corporation; and as a consequence matters remained in substantially the same condition from early 1933 until 1937.

On April 1, 1937, Century Investment Company (hereinafter called Century) acquired a majority of the common stock of the old corporation and also purchased all the defaulted secured obligations then held by Massachusetts. Century then filed a foreclosure suit against the old corporation on the properties securing those obligations, a completely separate judicial action from the one already pending by the trustees of Tower building deed of trust. Pursuant to a previously arranged plan, all of those properties, other than the Tower building, were purchased at the Century's foreclosure sale by Plaza Company, created by Century for that particular purpose. The old corporation had no equity in the properties so sold, and it executed a quitclaim deed to Plaza Company for all the properties thus purchased. This was accomplished on or by May 4, 1937.

Meanwhile, in October of 1936, the protective committee for all the holders of Tower building bonds, entered into an agreement with Dallas Rupe & Son, Inc. (hereinafter called Rupe), also holder of some of the Tower bonds, for the "reorganization" of the Tower Building alone. Under this agreement Rupe deposited with the committee a sum sufficient to buy the non-participating bonds at the rate of $20.00 for each $100.00 of principal amount of said bonds. The plan provided Rupe should receive voting trust certificates for the number of shares in a new company to which the non-participating bondholders would have been entitled; and, *in addition*, Rupe was to receive certificates covering three per cent of the shares to be issued to all participating bondholders, including his own, and those purchased. In the plan Rupe also agreed to negotiate a

loan to the new corporation for $100,000, to be secured by a first mortgage on the Tower building when acquired by it. The plan further provided the participating bondholders should receive voting trust certificates representing one share of common stock in the new corporation for each $100 of principal amount of bonds surrendered.

Pursuant to this agreement, the protective committee intervened in the foreclosure against the Tower building, setting forth the plan. The committee also agreed to assign all deficiency claims for the balance of principal and interest on the old bonds after the foreclosure to the old corporation, and the latter, in turn, agreed to withdraw all defenses to foreclosure proceedings.

On May 27, 1937, the court approved the plan and ordered the sale of the Tower building by the receiver appointed in 1933, and it was bid in by a nominee of the committee (not otherwise identified in the record) at foreclosure sale August 3, 1937, for $335,160. This sale was confirmed on August 27, following; and on August 31 the receiver conveyed the property, including building, lot, personal property and accounts receivable up to July 31, 1937, to Smith-Young Tower Corporation, the taxpayer herein.[1]

On the same date, the price bid by the committee's nominee was paid to the receiver by delivery of $1,667,000 face value of bonds for a credit of $300,060 and the balance of the bid, or $35,100, was paid by the committee with the cash received from Rupe under the plan previously mentioned. At the same time taxpayer issued 18,620 shares of its voting stock to voting trustees provided in the plan in consideration of all property conveyed to it. The trustees in turn issued stock to the bondholders at the rate previously stated of one share for each $100 in principal amount of bonds surrendered—16,970 shares to all participating bondholders, and 1,650 shares to Rupe for bonds purchased from nonparticipants. Later Rupe received 558 additional shares, amounting to three per cent of the entire issue to participating bondholders under the arrangement above mentioned with the Bondholders Committee. The deficiency claims against the old corporation were transferred to it, thereby being extinguished by confusion; and the old corporation at the same time executed a quitclaim deed to all property transferred to the taxpayer.

In determining depreciation and equity invested capital on its tax returns for the fiscal year ending May 31, 1943, the taxpayer used the same adjusted basis for the Tower building as had been used by the old corporation. The Commissioner used the fair market value on the date title was acquired by taxpayer (August 31, 1937), a much lower figure, and assessed deficiencies. Taxpayer paid and brought this suit to recover, contending that it acquired the property as a result of a nontaxable reorganization under Sections 112(b) (4) and 112(g) (1) (B) of the Revenue Act of 1936, 26 U.S.C.A. § 112(b) (4), (g) (1) (B),[2] which entitled it to use the same basis as the old corporation under Section 113(a) (7), 26

1. By subsequent amendment of its charter, taxpayer's name was changed to San Antonio Transit Company.
2. "Sec. 112. Recognition of gain or loss.
* * * * * *
"(b) Exchanges solely in kind—
* * * * * *
"(4) Same—Gain of corporation. No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, *solely for stock* or securities in another corporation a party to the reorganization." (Emphasis supplied.) 49 Stat. 1678, 1679.

"(g) Definition of reorganization. As used in this section and section 113—
"(1) The term 'reorganization' means * * * (B) the acquisition by one corporation in exchange *solely for all or a part of its voting stock:* of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or *of substantially all the properties of another corporation,* * * *." (Emphasis supplied.) 49 Stat. 1681,

U.S.C.A. § 113(a) (7).[3] Alternatively, it argued below and here that the transactions by which it acquired the property constituted a nontaxable exchange under Section 112(b) (5) of the Act[4] which entitled it to use the same basis, as provided in Section 113(a) (8).[5]

The trial court held that taxpayer acquired the property in a tax-free reorganization and rendered judgment accordingly. He did not pass upon the alternative contention.

In Helvering v. Alabama Asphaltic Limestone Company, 315 U.S. 179, 62 S. Ct. 540, 86 L.Ed. 775 it was held that the full priority rule of Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, places creditors in the same position as the old stockholders when an insolvency "reorganization" is being considered under this statute. At the outset, then, it is apparent that in order to meet the statutory requirements, tax-

payer must have acquired "substantially all the properties" of the old corporation "*solely* for all or a part of" taxpayer's voting stock.

However, taking into consideration the underlying congressional purpose of postponing tax consequences when there has been a change in form only, the courts have implemented the statutory language by establishing the "continuity of interest" test.[6] There have been many cases involving this problem, some of which also discussed "continuity of interest", each being decided on its own facts; but any attempt to summarize or discuss them all would unduly lengthen this opinion. As we understand the rationale of the cases, the courts do not purport to express any precise, iron-clad rule against which "continuity of interest" can be measured in every case. Compositely, the cases mean simply that facts must be presented from

---

3. "Sec. 113. Adjusted basis for determining gain or loss.

  \* \* \* \* \* \*

  "(7) Transfers to corporation. If the property was acquired—

  \* \* \* \* \* \*

  "(B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization, then the basis shall be the same as it would be in the hands of the transferor, \* \* \*." 49 Stat. 1683, as amended.

4. "(5) Transfer to corporation controlled by transferor.—No gain or loss shall be recognized if property is transferred to a corporation by *one or more persons solely* in exchange for *stock* or securities in such corporation, and *immediately after the* exchange such person or persons are in *control* of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange." (Emphasis supplied.) 49 Stat. 1679.

  "Control" was defined in Section 112 (h) to mean "the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation." 49 Stat. 1681.

5. "(8) Property acquired by issuance of stock or as paid-in surplus.—If the property was acquired after December 31, 1920, by a corporation—(a) by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), \* \* \* then the basis shall be the same as it would be in the hands of the transferor, \* \* \*." 49 Stat. 1683.

6. See, for example, Pinellas Ice & Cold Storage Co. v. Commissioner, 1933, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; LeTulle v. Scofield, 1940, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355; John Nelson Company v. Helvering, 1935, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281; Helvering v. Minnesota Tea Company, 1935, 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284, affirming, 8 Cir., 76 F.2d 797 and Southwest Natural Gas Company v. Commissioner, 5 Cir., 1951, 189 F.2d 332, 334. See also, Palm Springs Holding Corporation v. Commissioner, 315 U.S. 185, 62 S.Ct. 544, 86 L.Ed. 785; Bondholders Committee, Marlborough Investment Co. v. Commissioner, 315 U.S. 189, 62 S.Ct. 537, 86 L.Ed. 784; Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789.

which it can reasonably be concluded that the new corporation is in substance the old corporate enterprise in a new form.[7] Thus, it is seen that a creditor's plan must not only satisfy the literal language of the statute, but must also meet the "continuity of interest" test.

█ Appellant earnestly contends that the arrangement by which the interests of the dissenting bondholders were acquired by Rupe was actually a disguised transaction under which the corporation acquired part of the creditors' interest for cash. This being true, it argues, the taxpayer did not acquire the property *solely* for voting stock as required by the statute, citing Helvering v. Southwest Consolidated Corp., supra, footnote 6. This contention raises a serious and very close question; but since we have concluded that the "reorganization" involved here does not satisfy the continuity of interest test, we deem it unnecessary to pass upon the effect of the Rupe agreement as to the cash payment.

As was said in the Limestone case, supra [315 U.S. 179, 62 S.Ct. 543], "When the equity owners are excluded and the old creditors become the stockholders of the new corporation, it conforms to realities to date their equity ownership from the time when they invoked the processes of the law to enforce their rights of full priority. *At that time they stepped into the shoes of the old stockholders.*" (Emphasis supplied.) So it is clear that the rights of creditors under this statute are *derivative* rights— that they cannot have greater rights than the stockholders of the insolvent corporation would have had. Further, it is clear that their rights to claim a nontaxable reorganization under the statute date from the time when, because of insolvency, they displaced the stockholders. It follows that in the instant case, we must begin our consideration with the circumstances as they existed in late 1932 or early 1933, when the old corporation was in default on all its secured indebtedness and the creditors "stepped into the shoes of the old stockholders."

At that time the old corporation, though insolvent, was a unit—one business enterprise. When they displaced the stockholders the creditors voluntarily aligned themselves into two separate groups; and each group then took separate action affecting not the old corporation as an enterprise, but only the properties thereof. Each group operated only the properties connected with its respective claims, and it did so independently of the other group in separate proceedings. Obviously, the purpose of each group of creditors was to salvage the *property* against which it had claims, not to reorganize the old corporation as a going concern. There is nothing in the record to indicate that either group made any effort to become parties to or otherwise participate in the proceedings being conducted by the other group. When they separated and went their respective ways with only that portion of the properties to which their claims related, the creditors in effect dissected or carved the old corporation into two separate entities. When the Tower building was transferred to the taxpayer only the shell of the old corporation was left; the business enterprise which it had represented no longer existed; it had been decimated by the action of the other group of creditors; it could not be recast into a new and modified form in the sense contemplated by the statute requiring the transferee to acquire "substantially all the properties" of the old corporation.

In its brief taxpayer argues that in a situation such as the one presented here, either group of creditors may "reorgan-

7. See Treasury Regulation 94, promulgated under the Revenue Act of 1936 (Code of Federal Regulations, 1st Edition, Title 26, Section 3.112(a)–1, pages 246–247), which stated: " * * * The underlying assumption of these exceptions is that the new property is sub- stantially a continuation of the old investment still unliquidated; and, *in the case of reorganizations, that the new enterprise, the new corporate structure, and the new property are substantially continuations of the old still unliquidated."* (Emphasis supplied.)

ize" under the statute, with the other creditors disregarded for the purpose of the statutory test because of their lack of equity in the property transferred, citing *Peabody Hotel Company v. Commissioner,* 7 T.C. 600. It is true that in the Peabody case the Tax Court found a "reorganization" from insolvency proceedings which separated one group of properties from the mass and conveyed it to bondholders. It is also true that there may be language in the Tax Court's opinion which lends comfort to taxpayer's position. But it should be noted that in the Peabody case there was one unified insolvency proceeding under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207; that each phase of the series of events was under court direction *in the one proceeding* to which *all* creditors were parties; that the new corporation was found to be the substance of the insolvent corporation after the reorganization; and that the entire plan was approved by the requisite proportion of *all* creditors. The business enterprise of the old corporation was held intact throughout the proceeding, notwithstanding the transfer of one group of properties to another corporation. The division of the property took place as part of the one overall plan of reorganization. The Peabody case, therefore, is clearly distinguishable on its facts.

We do not base our conclusion here on any calculation of the percentage of the old corporation's property transferred to the taxpayer. Nor do we hold that it is necessary for all or any particular number of the old creditors to become stockholders in the new corporation. We simply hold that in this case, where the taxpayer acquired what amounts to only one property of a substantial enterprise as a result of proceedings and activities completely separate from all other property and from the claims of all other creditors, the necessary continuity of interest is not shown. Under no reasonable view can it be said that the old corporation has emerged as substantially the same enterprise in new form or that substantially all of its property was transferred to the new corporation.

If taxpayer's contention were adopted, it would be possible for the creditors of an insolvent corporation to effect as many nontaxable "reorganizations" as there were secured claims against assets. Each such creditor could foreclose against the particular asset securing his claim, transfer the asset to a new corporation and successfully contend that the new corporation was the new form of the old corporation. We are confident no such result was intended by Congress.

As stated earlier, taxpayer made an alternative argument below (incorporated in its complaint) to the effect that it acquired the Tower building and properties in a nontaxable exchange under Section 112(b) (5) and was therefore entitled to use the old corporation's basis under Section 113(a) (8). If we agreed with this contention we should affirm the judgment appealed from, even though the trial judge did not pass upon the question.[8] However, we are unable to sustain the judgment on this ground.

In the first place, there is considerable doubt that Section 112(b) (5) applies to an attempted creditors' reorganization effected in the manner presented to us here. But even if we assume, without deciding, that the series of events satisfied the language and purpose of 112(b) (5), we could not affirm the judgment, for the plain language of 113(a) (8) requires the transferee corporation to use the basis of its *transferor.*

Here, the bondholders completely displaced the stockholders in the old corpo-

---

8. R. E. Crummer & Co. v. Nuveen, 7 Cir., 147 F.2d 3, 157 A.L.R. 739. See also J. E. Riley Investment Co. v. Commissioner, 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36; Ohio Casualty Ins. Co. v. Marr, 10 Cir., 98 F.2d 973; Standard Oil Co. v. Lyons, 8 Cir., 130 F.2d 965; Petersen v. Coast Cigarette Vendors, Inc., 9 Cir., 131 F.2d 389; In re Barlum Realty Co., 6 Cir., 154 F.2d 562; Kam Koon Wan v. E. E. Black, Ltd., 9 Cir., 188 F.2d 558.

ration and the latter, as we have said, was obliterated for all practical purposes. The bondholders operated the Tower building through the receiver appointed in their foreclosure suit for some five years prior to the transfer to taxpayer. We find it impossible under these circumstances to consider the old corporation as having transferred the Tower building to taxpayer in exchange for the latter's stock. See Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 202, 62 S.Ct. 546, 86 L.Ed. 789; Helvering v. Cement Investors, Inc., 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649.

Therefore, even if it be conceded that there was a nontaxable exchange under Section 112(b) (5), which we do not here decide, the bondholders would be the "transferors" and their basis, not the old corporation's, would apply. Whatever the basis of the bondholders might have been, there is nothing in the record and no argument to show that it was the same as the old corporation's cost.

Taxpayer's complaint sought recovery of taxes based upon other alleged illegal findings by the Commissioner; and it is impossible to tell from the record whether any of its other claims were incorporated in the judgment rendered in its favor. Accordingly, the judgment appealed from is reversed, and the matter is remanded for whatever further proceedings or computations are necessary, consistent with the views expressed herein.

Reversed and remanded.

## On Petition For Rehearing

PER CURIAM.

The petition for rehearing in the above styled and numbered cause is hereby

Denied.

RIVES, Circuit Judge (dissenting).

Further consideration has convinced me that the taxpayer corporation acquired the assets of Smith Brothers Properties Company in a nontaxable reorganization as defined in Section 112(g) (1) (B) of the Revenue Act of 1936 (quoted in footnote 2 to the main opinion). The appellant collector insisted that there was no such reorganization upon the following grounds: (A) A continuity of interest, which is requisite to a reorganization, was lacking; (B) The taxpayer did not acquire "substantially all the properties" of the alleged transferor; (C) The taxpayer did not acquire the property of the transferor "solely" for "voting stock."

(A) Continuity of Interest.

This ground of attack, or this ground coupled with (B), "substantially all the properties", was the ground sustained in our original opinion:

"We simply hold that in this case, where the taxpayer acquired what amounts to only one property of a substantial enterprise as a result of proceedings and activities completely separate from all other property and from the claims of all other creditors, the necessary continuity of interest is not shown. Under no reasonable view can it be said that the old corporation has emerged as substantially the same enterprise in new form or that substantially all of its property was transferred to the new corporation."

The broad rationale of tax-free corporate reorganizations is thus stated in 3 Mertens Law of Federal Income Taxation, Section 20.50, p. 183:

"The justification for the exemption from taxation of gains realized in corporate reorganizations is that the parties making the exchanges have simply changed the form of their corporate holdings and that what was formerly a corporate business carried on by a particular corporation, or corporations, in a particular corporate form, or forms, is to be now carried on and continued by other and perhaps new corporations having new corporate form."

Applying that rationale, the courts have developed certain basic requirements implicit, if not expressed, in the statutes. 3 Id. Sec. 20.49, et seq. Among

these is the "continuity of interest" test developed in Pinellas Ice and Cold Storage Company v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428, and Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355. The essence of the "continuity of interest" rule is that the transferor or its stockholders must receive stock or a proprietary or equity interest in the transferee as opposed to solely a creditor's interest. Since the Pinellas and Le Tulle decisions, this requirement has been embodied in what is now Section 112(g) (1) (C), requiring that the exchange be "solely for all or a part of its (the new corporation's) voting stock." It seems to me that, though the continuity of interest requirement in such reorganization was theretofore implicit, it then became expressed and that if the requirement of the statute is met that is all that is necessary.

A very clear discussion of the "continuity of interest" requirement is contained in an article in the March, 1954, Tax Law Review published by the New York University School of Law on "realignment of Stockholders' Interests in Reorganizations under Section 112(g) (1) (D)". While that article relates to reorganization under Section 112(g) (1) (D),[1] rather than under Section 112(g) (1) (B), as in our case, the hypothetical case with which it concerns itself is very much the same as the case before us, and is stated as follows at the beginning of the article:

"A and B are the sole stockholders (each owning a substantial block of the stock) of a corporation engaged in conducting two separate operations, each of which in itself is a substantial business. They are actively engaged in managing the affairs of the corporation and have devoted a good part of their lives to it. They have reached an impasse on a fundamental question of management policy affecting the future course of the business of the corporation. Neither wishes to sell his interest and neither wishes to liquidate. What they would like to do is to divide the business into two corporations, each corporation taking over one of the operations, A acquiring control of one corporation and B acquiring control of the other, so that each may pursue what he regards as the proper management policy in conducting one of the two divisions of the existing business.

"To what extent is it possible to effect a reorganization of the business to accomplish this result and also to vest the ownership of the stock of one corporation in A and the other in B, without recognition of gain to the existing corporation and its stockholders? This question in its various aspects is the subject of this paper."

That article insists that there can be and is "a strict statutory test of continuity of interest", page 239, see also page 240. It quotes as the post-1934 concept of continuity of interest what this Court had stated in Southwest Natural Gas Company v. Commissioner, 5 Cir., 189 F.2d 332, 334:

"While no precise formula has been expressed for determining whether there has been retention of the requisite interest, it seems clear that the requirement of continuity of interest consistent with the statutory intent is not fulfilled in the absence of a showing: (1) that the transferor corporation or its shareholders retained a substantial proprietary stake in the enterprise represented by a material interest in the affairs of the trans-

---

1. Subsection (D), as it now reads, was not in force at the time of the reorganization in the present case. It was amended to read in its present form by Section 213(b) of the Act of June 29, 1939, and made applicable to tax years beginning after December 31, 1938, by Section 213(e) of said Act. See Historical Note to 26 U.S.C.A. § 112; 26 U.S.C.A. Internal Revenue Acts, 1924 to Date, pp. 1176, 1177; 53 Stat. 862–885.

**158**

feree corporation, and, (2) that such retained interest represents a substantial part of the value of the property transferred."

In the present case, the retained interest was common stock, the purest form of proprietary or equity interest in a corporation, and that stock represented the full value of the property transferred. It seems clear to me that the court made rule of continuity of interest has been met. Whether the stricter statutory test was also complied with is the subject of ground of attack (C) to be briefly discussed hereinafter.

### (B) "Substantially All The Properties".

In our original opinion, referring to the Limestone case, 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775, we held that the critical time for determining whether the taxpayer acquired "substantially all the properties" of the transferor was 1932 or 1933, the date of insolvency, rather than 1937, when the title to the property passed to the new corporation. It now seems clear to me that, under the teachings of the Limestone case, supra, the earlier date has reference only to the time when the bondholders stepped into the shoes of the stockholders, and that the later date is the one when the reorganization was perfected, and which we should consider in determining whether the taxpayer acquired "substantially all the properties" of the old corporation. In the Limestone case, supra, the tax-free reorganization was approved even though the bondholders had theretofore stepped into the shoes of the stockholders. In the present case, as of 1937, there can be no question but that the taxpayer acquired not substantially, but literally, all of the properties of Smith Brothers Properties Company.

In 1932 or 1933, the separate sets of bondholders stepped into the shoes of the stockholders. The bondholders were divided into two separate groups, each interested in the properties securing their respective bonds. Neither group was interested in the other group or in the properties securing its bonds, because the corporation was insolvent, the security represented the value of the bonds of either group and was insufficient to pay those bonds in full. There was no remaining equity in which the other group could be interested. In 1932 or 1933, the properties of Smith Brothers Properties Company were thus, in effect, split into two portions, and as to each portion separately the bondholders stepped into the shoes of the stockholders. Further, the other group of bondholders and the security for its bonds had been completely severed from the old corporation before the present reorganization was effected. While, therefore, it may not be necessary for a decision of the case, there seems to me to be no objection to divisive or multiple reorganization. That was held by the Tax Court in Peabody Hotel Company v. Commissioner, 7 T.C. 600, and is further demonstrated in the Tax Law Review article heretofore referred to, and in a number of decisions cited by appellee in support of its petition for rehearing.[2]

### (C) "Solely For Voting Stock".

The taxpayer corporation itself parted with nothing but voting stock in acquiring the Tower Building. The fact that part of that voting stock went to reimburse or compensate Rupe & Son, who furnished the funds to pay off the nonassenting bondholders, representing about 10% of the total bonds, does not defeat this requirement. The taxpayer got the property "solely for voting stock", even though Rupe & Son stepped

2. In re Prudence Bonds Corporation, 2 Cir., 79 F.2d 205; In re Parker-Young Co., D.C.N.H., 15 F.Supp. 965; Morley Cypress Trust v. Commissioner, 3 T.C. 84; Cullinan v. Walker, 262 U.S. 134, 43 S.Ct. 495, 67 L.Ed. 906; Rocke-feller v. United States, 257 U.S. 176, 42 S.Ct. 68, 66 L.Ed. 186; Reilly Oil Company v. Commissioner, 5 Cir., 189 F.2d 382; Lewis v. Commissioner, 1 Cir., 176 F.2d 646.

into the shoes of the dissenting bondholders.

Originally, at the time of its formation as Smith & Young Tower Corporation, taxpayer's only asset, received in exchange for all of its then outstanding voting stock, was the Smith-Young Tower Building. The net result of the reorganization was that the bondholders who had in 1932 or 1933 become the equity owners of the Smith-Young Tower Building became the stockholders of the taxpayer corporation which had as its only asset the same building. The bondholders simply changed the form of their corporate holdings. It appears to me that all of the requirements of a nontaxable reorganization as defined in Section 112(g) (1) (B) of the Revenue Act of 1936 have been met.

So thinking, I would express no opinion on the taxpayer's alternative position that it acquired the Tower building in a nontaxable exchange under Section 112(b) (5) further than to say that I think that we erred in holding that the bondholders rather than the old corporation transferred the Tower building to taxpayer. Cf. Bard-Parker Co., Inc., v. Commissioner, 2 Cir., 218 F.2d 52.

I respectfully dissent.