**PEARSON HOTEL, INC., an Illinois corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 54 C 1952, 56 C 2062.**

United States District Court
N. D. Illinois, E. D.
Sept. 15, 1959.

No. 54 C 1952:

Thompson, Raymond, Mayer, Jenner & Bloomstein, Frederick Mayer, Max Bloomstein, Jr., Edmond S. Sager, Herbert B. Olfson, Chicago, Ill., for plaintiff.

Robert Tieken, U. S. Atty., Chicago, Ill., for defendant.

No. 56 C 2062:

Thompson, Raymond, Mayer, Jenner & Bloomstein, Frederick Mayer, Max Bloomstein, Jr., Edmond S. Sager, Her-

bert Olfson, Robert F. Fuchs, Chicago, Ill., for plaintiff.

Robert Tieken, U. S. Atty., Chicago, Ill., for defendant.

ROBSON, District Judge.

■■ These two suits for refund of corporate income taxes involve different tax periods of the same taxpayer and concern the same legal issue. Plaintiff claims the right, under Section 113(a) (22) of the Internal Revenue Code of 1939,[1] to use its corporate predecessor's basis for depreciation of its hotel property rather than the fair market value of said property at the time of its acquisition on foreclosure sale. This issue is in turn resolved by a determination of whether plaintiff acquired the property pursuant to a tax-free, court-approved plan of reorganization within the meaning of section 112(b) (10) [2] of the Internal Revenue Code of 1939.

Detailed stipulations of fact have been entered into by the parties in the respective cases, and able, consolidated trial briefs filed. On an examination of the facts and law as submitted by the plaintiff and the defendant, we conclude that the plaintiff's contentions are well founded.

Plaintiff's claim for refund in cause 54 C 1952 is for $2,763.84 (plus interest from December 15, 1950) for the tax period beginning June 1, 1950, through September 30, 1950. The taxes actually paid were $9,704.50 ($8,566.07 initially, and $1,138.43 later) and the tax plaintiff as-

1. Sec. 113. "(a) *Basis (unadjusted) of property.* The basis of property shall be the cost of such property; except that— * * *

"(22) *Property acquired on reorganization of certain corporations.* If the property was acquired by a corporation upon a transfer to which section 112(b) (10) * * * is applicable, then * * * the basis in the hands of the acquiring corporation shall be the same as it would be in the hands of the corporation whose property was so acquired, * * *."

2. Sec. 112 "(b) (10) *Gain or loss not recognized on reorganization of corpora-*

*tions in certain receivership and bankruptcy proceedings.* No gain or loss shall be recognized if property of a corporation * * * is transferred, in a taxable year of such corporation beginning after December 31, 1933, in pursuance of an order of the court having jurisdiction of such corporation—

"(A) in a receivership, foreclosure, or similar proceeding, * * * to another corporation organized or made use of to effectuate a plan of reorganization approved by the court in such proceeding, in exchange solely for stock or securities in such other corporation."

serts to have been paid was $6,940.66. Plaintiff's depreciation figure was $7,130.48 for the four months covered by the return on an annual rate of $21,391.44.

The claim for refund in No. 56 C 2062 concerns the fiscal years ending September 30, 1951, 1952 and 1953, for the sums $9,936.58, $10,822.51 and $15,026.41, respectively, plus interest. As in the other suit, plaintiff asserts an annual depreciation deduction allowance of $21,391.44.

Plaintiff's predecessor corporation, Pearson Hotel Corporation, was organized in 1922, with preferred and common stock and a $1,250,000 six and one-half per cent bond issue which became in default in 1929 when $982,000 thereof was still outstanding. In January, 1930, a Bondholders Protective Committee was organized. The Committee called for deposit of the outstanding bonds with depositaries under a deposit agreement dated December 12, 1929, which named the Chicago Title & Trust Company, and others, as depositary. The Committee caused foreclosure proceedings to be instituted in August, 1930, and the Chicago Title & Trust Company was appointed receiver. A final decree of foreclosure was entered in November, 1931. In July, 1933, the Committee adopted a "Plan" pursuant to Article IV of the Deposit Agreement and

named a nominee to purchase the property subject to the first mortgage and prior liens. The Committee had purchased subordinate liens. The nominee of the Committee, Harlan Cooley, in August, 1934, bid $78,600 for the real estate foreclosed but the bid was refused as inadequate, and it was increased to $268,000 for the realty, which bid was approved by the Judge of the Circuit Court in July, 1935. The Bondholders' Committee's pleading stated the Committee had $954,244.12 of the $979,344.12 outstanding bonds (all but $25,100). The agreement of July 15, 1935, was captioned, "Pearson Hotel Liquidation Trust Agreement" and named Chicago Title & Trust Company as trustee and James B. McCahey, George S. Lurie and W. J. Zucker trust managers. By order of the Circuit Court, on December 31, 1935, the Chicago Title & Trust Company was directed to deliver the property to itself as trustee under the Agreement.

After the redemption period expired, the Chicago Title & Trust Company conveyed the realty to the nominee, who in turn conveyed it to the trustees under the Agreement. They operated the hotel property and at the end of fifteen years exercised an option given them under Article XV [3] of the Agreement, of not sell-

3. The critical Article XV provided in part: "This trust may be terminated at such time as the Trust Managers in their sole discretion may determine, or by the written direction *. * * of the * * * majority of the units of beneficial interest, * * * it being the intention, however, that the Trust Property be sold and liquidated as soon after the institution of this trust as conditions may permit, and the net proceeds thereof distributed to the Certificate Holders; but *if not sooner terminated, then this trust in any event shall terminate within fifteen (15) years from and after the date hereof.* "Immediately upon the termination of this trust * * * twenty (20) days' notice in writing shall be given to all the Certificate Holders, * * * that all of the then undisposed of Trust Property held by the Trustee hereunder will be sold, * * * and upon any such sale or sales the Trustee shall have the power to transfer and convey * * * the properties of the trust * * * and the

net proceeds of such sale or sales * * * shall be divided pro rata among the holders of certificates of interest issued and then outstanding hereunder, to be paid to each upon such surrender of his certificate and the giving by him of such evidence of identity * * *; *however, the Trustee, in lieu of selling the trust property and distributing the net proceeds upon the termination of this trust, by lapse of time, or otherwise, * * * shall, upon direction in writing from the Trust Managers to that effect, cause the trust property * * * to be used for the purpose of buying up the capital stock of a corporation by transfer and conveyance of the trust property to such corporation, and in such case the Trustee shall distribute the stock of such corporation in like manner pro rata among the said holder or holders of the units of beneficial interest* then outstanding; * * * *" (Emphasis ours.)

**36**

ing the property but conveying it to the newly formed corporation, the plaintiff, Pearson Hotel, Inc. (organized by the trust managers), in exchange for the plaintiff's 9,602 shares of $10 par value stock. These shares of stock were then exchanged for the 9,602 certificates of interest issued under the Agreement.

It is the nature of this transfer which poses the problem here. Plaintiff claims the transfer was the final step in the long-prior, court-approved plan of reorganization and entitles plaintiff to use its corporate predecessor's basis for depreciation purposes in calculating its income tax liability. It is the Government's contention that the Agreement was, precisely as it was called, a "Liquidation" agreement, not a statutory plan of reorganization, and plaintiff's basis of depreciation is the fair market value of the property.

· The Agreement recites, *inter alia*, the deposit of bonds with the Committee, pursuant to a deposit agreement, to procure the property for them upon foreclosure. The object of the trust is said to be the sale or liquidation of the property and the distribution of the net proceeds, and in the meantime, the maintenance and management of the property. Article II grants power to the trustee to sell the property to another trust or corporation in exchange for stocks, bonds or other securities, and grants many other powers to the trustee. In case of a disagreement between the trust managers and the trustee as to compensation of agents, the conflict was to be settled by the judge having charge of the foreclosure proceedings, as also was a conflict in the appointment of a successor trust manager. It further provided for the issuance of certificates of interest. No change in the Agreement which materially affected the rights of the certificate holders was to be made by the trust managers without prior

notice to the holders and if one-third or more objected the proposed change would not be effective.

It is plaintiff's contention that the sale to it, pursuant to the alternate provision of Article XV of the Agreement, in exchange for all its stock, was the culmination of a plan of reorganization approved by the order of Judge Benjamin Epstein of the Circuit Court of Cook County back in July, 1935, effective as of the preceding May 16 when the foreclosure proceedings were pending before him. They discount the nomenclature of the instrument as a Liquidation Agreement and hold irrelevant the lapse of fifteen years between the approval of the plan and the sale here involved (citing Standard Coal, Inc., 20 T.C. 208). Plaintiff also points out that in this case there can be no doubt that the requirement of "continuity of interest" is present (Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Mascot Stove Co. v. Commissioner of Internal Revenue, 120 F.2d 153 (C.C.A. 6, 1941); Western Mass. Theatres, Inc. v. Commissioner of Internal Revenue, 236 F.2d 186 (C.A. 1, 1956)) where the bondholders, as creditors, succeeded to ownership.

Plaintiff states it is here only claiming the benefit of the underlying Congressional purpose of postponing tax consequences when there has been a change in form only. (Scofield v. San Antonio Transit Company, 219 F.2d 149 (C.A. 5, 1954)).

Plaintiff further cites Treasury Regulations 118, 39.112(b) (10)–1 [4] which provides that "It is unnecessary that the transfer be a direct transfer from the insolvent corporation; it is sufficient if the transfer is an integral step in the

---

4. Another pertinent section [39.112(b) (10)–1(a) (3)] of Treasury Regulations 118 provides that "the section [112(b) (10)] is inapplicable unless there is a bona fide plan of reorganization approved by the court having jurisdiction of the proceeding and the transfer of the property of the insolvent corporation

is made pursuant to such plan. *It is unnecessary that the transfer be a direct transfer from the insolvent corporation; it is sufficient if the transfer is an integral step in the consummation of the reorganization plan approved by the court.*" (Emphasis ours.)

consummation of the reorganization plan approved by the court." It further relies on Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775, where the Supreme Court talked of "steps" in a reorganization and intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan, the determinative and controlling factors being the debtor's insolvency and an effective command by the creditors over the property. Plaintiff also relies on the case of Palm Springs Holding Corporation v. Commissioner of Internal Revenue, 315 U.S. 185, 62 S.Ct. 544, 546, 86 L.Ed. 785, where the court said, "The legal procedure employed by the creditors is not material. The critical facts are that the old corporation was insolvent and that its creditors took steps to obtain effective command over its property." Plaintiff cites a four-year interval in the formulation of a plan in the case of Roosevelt Hotel Co., 13 T.C. 399. The Court said, "There is no statutory requirement that a plan be immediately adopted and to require this would disqualify as reorganizations many of the financial readjustments Congress intended to have included. It is inevitable that there be some delay in arriving at a solution satisfactory to the great majority of interested bondholders or creditors. * * *"

The Government contends that there was no bona fide plan of reorganization nor was the property transferred from the old to the new corporation pursuant to court order. It stresses the nomenclature of the Agreement as a *Liquidation* Trust Agreement, and the fact that liquidation was the primary aim of the parties, and the sale to plaintiff, the new corporation, at the end of the long fifteen-year interval was but an alternative choice solely within the discretion of the trust managers and not the choice of the court.

The Court is impressed with the fact that the depositing bondholders, or their assignees, were the interested parties in this property from the time of the deposit of their bonds through the various changes in the evidence of their interests to the final step of the formation of the plaintiff for whose stock they exchanged their certificates of deposit.[5] While the main hope of these persons was probably a liquidation of the property and receipt of cash,

---

5. In delineating the general law in respect to corporate reorganizations, generally, Mertens in Law of Federal Income Taxation states:

(Sec. 20.54) " * * * the courts have developed certain basic requirements which are implicit. * * * The three principal requirements are as follows:

" * * * a transaction for which a reorganization status is sought must be one in which there is a reformation or a reshaping of existing corporate business for the purpose of continuing that business in the new and changed corporate form.

"The second requirement is that a corporation which transfers such a business to another corporation must either itself, or in its stockholders, retain a stake or interest in the reorganized corporate business in the form of stock therein.

"The third requirement is that this stock must represent a substantial part of the value of the properties transferred to the new corporation."

(Sec. 20.55) " * * * The justification for the exemption from taxation of gains realized in corporate reorganizations is that the parties making the exchanges have simply changed the form of their corporate holdings and that what was formerly a corporate business carried on by a particular corporation * * is to be now carried on and continued by other and perhaps new corporations having new corporate form."

(Sec. 20.64) *"Plan of reorganization.* * * * The plan need not take any particular form and need not possess any special formality; * * * it may be amended as circumstances dictate."

(Sec. 20.66) " * * * If the liquidation and reorganization are related parts of an integrated plan, the total situation will be stamped with the character of the reorganization, precluding recognition of gain or loss on the liquidation; * * *

"If business exigencies so require, the distribution in pursuance of the plan of reorganization may occur several years after the reorganization, provided it be established that the plan of reorganization so provided or contemplated."

the possibility was also contemplated at the time of the formulation of the Agreement, that their hope of liquidation would not be fulfilled and the original bondholders would have to be content with a substitute paper document, a new share of stock in a corporation formed pursuant to the Agreement. The Circuit Court's order adopted the whole of the Agreement and approved it. It cannot be said the Court approved only the liquidation aspect and not the possible alternative of transfer to a new corporation as a solution to the financial problem. True, the choice to do so was left to the trust managers, but the Court, when it approved the Agreement, left that choice to those managers.

The Government's contention that the property of the insolvent corporation to plaintiff corporation was not pursuant to a specific order of court seems but a variation of its other contention. There was of course no approval of this specific transfer to plaintiff, but there was authority granted in future by the Circuit Court order to make that transfer. A reading of the order would indicate that the Judge deemed the Liquidation Agreement as an implementation of the Plan of Reorganization of July, 1933, to which he continually referred and approved, and made incidental reference to the "said trust agreement."

It might be conceded that the Agreement contemplated liquidation primarily and reorganization only secondarily, yet the Circuit Court must have deemed the Agreement a part of a plan of reorganization because it so frequently referred to the plan of reorganization in its order of approval. This sale to plaintiff was not the "afterthought" referred to in Ketler v. Commissioner of Internal Revenue, 196 F.2d 822 (C.A. 7, 1952), since it was specifically covered by the court order of approval.

A careful reading of the facts makes it clear that there was here no liquidation, but a reorganization slowly evolved pursuant to a court plan where all but two per cent of the bondholder creditors, who initially owned interests in this hotel property, ended up owning interests in plaintiff in the same proportions as they had held interests in the intermediate stages of the reorganization.

The judgment in each of these causes will, therefore, be for the plaintiff, with interest and costs.